# GMH Assocs. Inc. v. Prudential Realty Group

226

C.P. of Delaware County, no. 96-17366.

*Joseph Fioravanti, James Rohm* and *Patricia Hamill*, for plaintiff.
*Robert M. DiOrio, Mark Wilcox* and *David Abernathy*, for defendants.

C.P. of Delaware County, no. 96-17366.

CLOUSE, *J.,* September 16, 1998—A non-jury trial was held on June 15 through 19, 1998, June 23 through 25, 1998 and July 22, 1998 on plaintiff GMH Associates Inc.'s claim wherein it seeks damages arising out of the failure of a commercial real estate transaction.

In connection with this matter, the court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

*The Property*

(1) The subject matter of this action is "Bala Plaza," a parcel of commercial real estate comprised of 61.5 acres of land and improvements thereon, including three office buildings containing approximately 995,000

square feet, located in One Bala Plaza, Two Bala Plaza, Three Bala Plaza (East and West) and the Saks Fifth Avenue Department Store, consisting of approximately 100,000 square feet.

(2) During the time period relevant to this case, Prudential was the owner of the Bala property. (N.T. 6/23/98, p. 140.)

### The Parties to the Negotiations and Their Representatives

(3) GMH Associates is a multi-faceted real estate investment company that serves as an umbrella for affiliated companies that invest in, develop, and manage real estate. (Geiser N.T. (6/19/98), pp. 90-91; Holloway N.T. (6/15/98), p. 38.)

(4) Gary Holloway is the chief executive officer of GMH (N.T. 6/15/98, p. 38), and Bruce Robinson is an executive vice president and chief financial officer for GMH. (Robinson N.T. (6/18/98), p. 72.) Mr. Holloway and Mr. Robinson were GMH's representatives in negotiations with Prudential, AHERF, Goldman Sachs, and GE Capital.

(5) Prudential Realty Group is an unincorporated division of The Prudential Insurance Company of America. (Triece N.T. (6/23/98), pp. 48-49.)

(6) During the fall of 1995, Prudential entered into a sales agency agreement with CB, a commercial brokerage company, to market the property. (P-40, sales agreement.)

(7) Devon Glenn, a vice president of Prudential Realty, was "placed in charge of the disposition of the Bala properties." (Exhibit P-234, Glenn deposition

(2/24/97), pp. 6-7, 19);[1] Holloway N.T. (6/15/98), p. 55.) He reported to John Triece, managing director, and with respect to the Bala deal, to the investment committee, which included Dave Twardock, head of the realty group, and Mr. Triece. (Glenn N.T. (6/23/98), p. 144.195; see also, Triece N.T. (6/23/98), pp. 51-52.) Mr. Twardock and Mr. Triece were the primary decision-makers for Prudential regarding the Bala deal. (Triece N.T. (6/23/98), p. 52.)

(8) Douglas Joseph, a vice president of CB, was the CB representative responsible for marketing the property. (Exhibit P-236, Joseph deposition, pp. 9, 17);[2] Mr. Joseph reported to Glenn Whitmore, vice president and managing director for investment properties at CB. (See exhibit P-1, Holloway; N.T. (6/15/98), pp. 58-59.)

(9) As part of its 1995 marketing efforts, CB sent offering materials to 26 prospective buyers. Approximately 15 of these responded. Although the asking price was $136,000,000, all of the responding prospective

1. Admissions of Devon Glenn from deposition testimony dated February 24, 1997 appear generally on pages 33 through 128 of the June 17, 1998 trial transcript. Mr. Glenn's deposition transcript, with GMH Associates' admission designations highlighted, was admitted as exhibit P-234. When referring to the admissions of Devon Glenn from this point on, the admissions will be identified by the deposition transcript pages rather than the trial transcript pages.

2. Admissions of Douglas Joseph from deposition testimony dated March 3, 1997 (volume 1) and March 4, 1997 (volume 2) appear generally on pages 207-39 and 241-42 of the June 17, 1998 trial transcript. Mr. Joseph's deposition transcripts, with GMH Associates' admission designations highlighted, were admitted as P-236 and P-237, respectively. When referring to the admissions of Douglas Joseph from this point on, the admissions will be identified by the deposition transcript page designations rather than the trial transcript page designations.

buyers made tentative offers in a range between $80,000,000 and $108,000,000. (Exhibit P-236, Joseph dep. (3/3/97), pp. 41-48; P-1.)

(10) Devon Glenn was Prudential's "team leader" for the project. (Fascitelli N.T. (6/19/98), p. 30; see also, Holloway N.T. (6/15/98), p. 55.) The court finds Mr. Holloway credible when he testified that he was informed by Doug Joseph that Devon Glenn was "running the deal for Prudential" and that he had no discussions with anyone on the Prudential side other than Mr. Glenn and Mr. Joseph. (Holloway N.T. (6/15/98), pp. 56-57, 85-86.) A team leader is a person who has "the primary role for organizing that transaction, being an interface with the bankers and sometimes being an interface with the outside world, for instance outside brokers, outside potential buyers." (Fascitelli N.T. (6/19/98), p. 30.)

(11) Goldman Sachs, one of the largest investment banking firms in the United States (or the world), through its Whitehall Fund, which served as a vehicle for Goldman's real estate transactions, was to provide equity financing for the Bala deal in partnership with GMH. (Fascitelli N.T. (6/19/98), pp. 8, 11-12, 38; see also, Holloway N.T. (6/15/98), pp. 69-70.) Goldman was to provide 90 percent of the equity and GMH 10 percent. (Robinson N.T. (6/18/98), pp. 159-60; Holloway N.T. (6/15/98), p. 74.)

(12) General Electric Capital Corporation, a large lending and investment institution, was to provide debt financing for the Bala deal. (See Holloway N.T. (6/15/98), p. 73; Kurz deposition (5/1/98), p. 10.)[3] At

---

3. Admissions of Fred Kurz dated May 1, 1998 appear generally on pages 154 through 165 of the June 24, 1998 trial transcript. Plaintiff GMH Associates' admissions were included with defendants' ad-

the time of the Bala deal, GMH was one of GE Capital's "tier one" customers, and GMH was already in partnership with GE Capital relating to other GMH real estate holdings. (Kurz dep. (5/1/98), p. 81.)

*GMH's Plan for the Bala Property*

(13) The court finds Mr. Robinson credible when he testified that GMH planned that, simultaneous with the closing with Prudential, GMH would sell Three Bala East to Allegheny Health Education Research Foundation ("AHERF"); that the sale was structured so that the ground under the building was to be sold to Allegheny for $6.2 million and then the rest of the value of the transaction was to be paid in the form of a lease over a 20-year period; that GMH and its partner, Goldman Sachs, planned to package the AHERF transaction as a bondable lease, which would have been sold to investors at market rates netting GMH and Goldman approximately $31,000,000; that AHERF was also going to take an option on Three Bala West; and that remaining properties would then be managed by GMH, which would generate various management and construction fees for GMH. (Robinson N.T. (6/18/98), pp. 156, 165, 168; McGoldrick N.T. (6/17/98), pp. 154-55.)

(14) The court further finds Mr. Robinson credible when he testified that GMH planned to roll the Bala acquisition into its eastern office portfolio, which already contained approximately $90,000,000 worth of commercial office buildings. GMH would then have combined that portfolio with some other office prop-

missions as part of a highlighted deposition transcript of Mr. Kurz which was submitted to the court. When referring to the admissions of Frederick Kurz from this point on, the admissions will be identified by deposition transcript pages rather than the trial transcript pages.

erties so that they could establish an REIT that specialized in office properties in the suburban Philadelphia area. (Robinson N.T. (6/18/98), pp. 157-58.)

*The Role of Goldman Sachs and Michael Fascitelli*

(15) Goldman Sach's role in the Bala transaction, through its Whitehall Fund, was to back GMH in the purchase of the Bala property. (Fascitelli N.T. (6/19/98), p. 38.)

(16) Michael Fascitelli, then a partner at Goldman, and the head of the firm's real estate investment banking, had developed a relationship with Mr. Holloway a year or two before the transaction involving the Bala property, starting in approximately 1994. (Fascitelli N.T. (6/19/98), p. 38.)

(17) In the spring of 1996, Mr. Holloway brought the Bala property to Michael Fascitelli's attention, and GMH supplied him with information regarding the proposed transaction and with a plan of acquisition. (Fascitelli N.T. (6/19/98), pp. 39, 46; exhibit P-128.) The court finds Mr. Fascitelli credible when he testified that "[w]hen the transaction came, because it was Prudential who we enjoyed a good relationship with and because of Gary and because we thought it would fit into a plan, we proceeded and said, if it works out economically, we'd be—Whitehall would be prepared to do a deal with you." Whitehall's commitment was made orally. (Fascitelli N.T. (6/19/98), pp. 39-41.)

(18) The court further finds Mr. Fascitelli credible when he stated that most of the work regarding the Bala transaction, including the negotiations, was done by Gary Holloway and his people at GMH, Devon Glenn and Prudential; that Goldman Sachs was a money source, and did not have a day-to-day involvement in the transaction; that Mr. Fascitelli was involved in

Whitehall's decisions regarding its participation; in "shaping the business deal with Gary that we were prepared to make"; and because of his experience with Prudential, in giving advice concerning how to deal with Prudential. (Fascitelli N.T. (6/19/98), pp. 41-42.)

(19) The court finds Mr. Fascitelli credible when he stated that he had experience over a 10-year period in dealing with Mr. Twardock and Mr. Triece; that he spoke with Mr. Triece and occasionally to Mr. Twardock regarding the Bala transaction; and that he never got the impression from either Mr. Triece or Mr. Twardock that Mr. Glenn was acting without authority in the negotiations that were going on with GMH. (Fascitelli N.T. (6/19/98), pp. 43-45.)

### GMH Receives Offering Materials Related to the Bala Deal

(20) The court finds that GMH entered into an agreement on or about February 2, 1996 ("disclaimer agreement") as a condition of receiving the offering materials that had been prepared for prospective purchasers. (Exhibit D-137, P-3.) The court further finds that Prudential would not have entertained GMH's interest unless GMH had agreed to the disclaimer agreement.

(21) GMH received copies of the offering materials by March 14, 1996, and by March 21, 1996, GMH tendered its first offer for the property. (Exhibit P-236, Joseph dep. (3/3/97), pp. 100, 126-27; see also, Holloway N.T. (6/15/98), p. 51.)

(22) On April 24, 1996, Gary Holloway and Bruce Robinson for GMH met with Devon Glenn for Prudential and Douglas Joseph and Glenn Whitmore for CB to discuss GMH's interest in the property. (Exhibit P-234, Glenn dep. (2/24/97), pp. 29-30.) Gary Holloway

told Prudential that GMH was looking to AHERF as a tenant for one of the buildings. (Holloway N.T. (6/15/98), pp. 58-60, 62-63.)

(23) The court finds Mr. Glenn credible when he testified that he knew that Mr. Holloway was in a "Catch-22" situation—he needed Prudential's agreement to take the property off the market so he could attempt to secure the tenant, and he could not pay the agreed price without securing the tenant. (Exhibit P-234, Glenn dep. (2/24/97), pp. 42-44; Glenn N.T. (6/23/98), p. 240; see also, Holloway N.T. (6/15/98), pp. 63-64.) The court finds Mr. Holloway credible when he testified that Mr. Glenn made clear to him that he was representing Prudential and was Prudential's "mouthpiece" (Holloway N.T. (6/15/98), p. 61) and that Mr. Glenn told him they could reach an agreement on this if the investment committee approved the price which was more or less a "rubber stamp." (Exhibit P-234, Glenn dep. (2/24/97), p. 44; Glenn N.T. (6/23/98), pp. 152-53; Holloway N.T. (6/15/98), pp. 61-62.)

(24) The court finds Mr. Holloway credible when he testified that he discussed with Mr. Glenn that the AHERF transaction was a way to give Prudential a premium price for the property, above what the market was willing to pay. (Holloway N.T. (6/15/98), pp. 62-63.)

(25) The court finds Mr. Glenn credible when he testified that he understood that Mr. Holloway needed assurances that as long as Prudential was negotiating with him, Prudential would not be negotiating with anybody else. (Glenn N.T. (6/23/98), p. 240.)

(26) The court finds Mr. Holloway credible when he testified that on April 26, 1996, Mr. Glenn and Mr. Holloway agreed on a price of $109,250,000; that Mr. Glenn said he discussed the transaction with "his people"; that when Mr. Holloway asked whether the prop-

erty was off the market, Mr. Glenn responded that "it is 100 percent off the market, the deal is your deal, he said proceed [with due diligence]"; that Mr. Holloway said he would be spending a lot of money on due diligence and needed to know he had a deal, and that Mr. Glenn said, "You have a deal, proceed, and you will be getting the written documents from our lawyers." (Holloway N.T. (6/15/98), pp. 65-66.)

(27) The court further finds Mr. Holloway credible when he testified that on May 13, 1996, Mr. Glenn met Meg McGoldrick, then president and CEO of Allegheny University Hospital's Delaware Valley Division, to determine AHERF's interest in the property, in order to "understand the viability of the stepped-up price of $109,250,000 (see Holloway N.T. (6/15/98), pp. 97-98) and that he concluded AHERF's involvement was sufficient to justify Prudential's entering into a letter of interest with GMH. (Holloway N.T. (6/15/98), pp. 68, 79-80.)

### GMH and Prudential Sign Letter of Interest

(28) On May 13, 1996, Prudential and GMH entered into a "letter of interest" (LOI), which was drafted by Prudential. (Exhibit P-234, Glenn dep. (2/24/97), pp. 92-94; exhibit P-16.)

(29) The court finds Mr. Glenn credible when he testified that entering into a letter of interest would then technically allow Mr. Holloway the opportunity to secure or attempt to secure his tenant . . . "without competing negotiations with other possible suitors for this property." (Exhibit P-234, Glenn dep. (2/24/97), p. 33; see also, Glenn N.T. (6/23/98), p. 240.)

(30) The LOI included the following information: a detailed description of the premises to be purchased; a purchase price of $109,250,000 and the methodology

for paying it; a closing date; a provision for the timing of due diligence and the party to bear the cost of the same; responsibility for brokers' commissions; a time period within which the buyer's due diligence would be completed; and a statement that the property would be sold "as is." (Exhibit P-14, (5/13/96).) The court finds Mr. Glenn credible when he testified that the purpose of the LOI was "[t]o set forth the kind of process between May 13 and the closing date, the process being time, what the expectations were, who was going to pay for what regarding closing, just to kind of put a framework together." (Exhibit P-234, Glenn dep. (2/24/97), pp. 93-94.)

(31) The court finds Mr. Triece credible when he testified that he was Mr. Glenn's supervisor, and a managing director at Prudential Realty Group; that the LOI was not intended to be a final purchase and sale agreement, and it included a provision that either side could "terminate" negotiations at any time; and that notice was necessary. (Exhibit P-235, Triece dep. (3/18/97), pp. 57-59;[4] see also, Giuliani N.T. (6/16/98), p. 232.)

(32) The court further finds Mr. Triece credible when he testified that Prudential and CB agreed that the property would stay "off the market" after Prudential signed the LOI as long as GMH was "seriously pursuing the acquisition of the property and [was] meeting the deadlines that they had proposed to [Prudential]." (Exhibit

---

4. Admissions of John Triece from deposition testimony dated March 18, 1997 appear generally on pages 194-206 of the June 17, 1998 trial transcript. Mr. Triece's deposition transcript, with plaintiff GMH Associates' admission designations highlighted, was admitted as exhibit P-235. When referring to the admissions of Devon Glenn from this point on, the admissions will be identified by the deposition transcript page references rather than the trial transcript page references.

P-235, Triece dep. (3/18/97), p. 67.) The court finds Mr. Glenn credible when he testified that he understood that "as long as [Prudential was] . . . negotiating with Gary Holloway, he [Mr. Holloway] needed to understand that . . . [Prudential] was not negotiating with anybody else . . . ." (Glenn N.T. (6/23/98), p. 240.)

(33) On May 14, 1996, Mr. Glenn wrote a memo to the Prudential Realty Investment Committee advising that Prudential was entering an LOI with GMH and that GMH would be proceeding with due diligence, contract negotiations and lease documentation with the tenant. (Exhibit P-15, (5/14/96).) In this memo from Devon Glenn to Prudential Realty Investment Committee, re: Bala Plaza letter of interest, he stated:

"While all contingencies have not been removed, I feel we are proceeding forward in a prudent manner. We have gotten GMH to begin spending money on due diligence within a 45-day window. And, the offer remains at $109,250,000." (Exhibit P-15.)

(34) The court finds Mr. Glenn credible when he testified that Prudential typically did not market a property to other people when it had a letter of interest. (See Glenn N.T. (6/17/98), p. 153.) Consistent with its policy, Prudential did take the property off the market after obtaining the LOI, because GMH was "working with their tenant and they were doing their due diligence." (Exhibit P-235, Triece dep. (3/18/97), pp. 64-65; see also, exhibit P-236, Joseph dep. (3/3/87), pp. 177-78.) The court further finds Mr. Glenn credible when he testified that regardless of any theoretical definitions of "off the market," Prudential recognized that "as long as [it was] . . . negotiating with Gary Holloway, he needed to understand that . . . [Prudential] was not negotiating with anyone else . . . ." (Glenn N.T. (6/23/98), p. 240.)

(35) In late May or early June 1996, GMH learned that, for a 90-day period, AHERF would not be able to actively negotiate on the proposed lease transaction because AHERF was in the midst of a bond issue and had not disclosed the Bala Plaza lease transaction as part of that issue. (Holloway N.T. (6/15/98), pp. 87-88; see also, McGoldrick N.T. (6/17/98), pp. 139-40; exhibit 6.)

(36) The court finds Mr. Holloway credible when he testified that he called Mr. Glenn when the issue with AHERF arose, told him about it, and said he thought it could be resolved without affecting the closing date. (Holloway N.T. (6/15/98), pp. 87-92; Holloway N.T. (6/16/98), pp. 123-24.)

(37) The court finds Mr. Glenn credible when he testified that he agreed that the issue could be resolved and assured Mr. Holloway several times that Prudential would work with GMH and that the deal was still GMH's deal. (Holloway N.T. (6/15/98), pp. 89, 109.)

(38) The court further finds Mr. Glenn credible when he testified that on July 1, the parties agreed to extend the LOI in order to give Prudential and GMH an opportunity to reach a final accord upon the purchase price, adjustments related to capital improvements and the questions of whether Prudential would be willing to accept an "earn-out," a partial payment, to be paid upon completion of the lease-purchase agreement between GMH and its planned tenant, AHERF. (Exhibit P-234, Glenn dep. (2/24/97), pp. 130-34; exhibit P-236, Joseph dep. (3/3/97), pp. 170-74.)

(39) The court finds Mr. Holloway credible when he testified that he asked Mr. Glenn if the LOI extension should be put in writing; that Mr. Glenn assured him that it was not necessary and that Prudential would go forward with GMH on a verbal basis; and that LOI

was extended to July 31. (Holloway N.T. (6/15/98), pp. 99-100; Glenn N.T. (6/23/98), pp. 240-41.)

(40) Although Mr. Glenn testified he did not recall discussing whether the property would stay off the market, Prudential did, in fact, keep it off the market in July 1996. (See exhibit P-234, Glenn dep. (2/24/97), pp. 216-17.)

(41) The court finds Mr. Triece credible when he testified that Prudential considered the property to be "off the market" at least from May 13, 1996 until August 12, 1996. (Exhibit P-234, Glenn dep. (2/24/97), pp. 216-17; exhibit P-235, Triece dep. (3/18/97), pp. 64-65.)

## GMH/Prudential Negotiations Between May and August

(42) The court finds Mr. Glenn credible when he testified that between May and August 1996, GMH and Prudential engaged in extensive negotiations to finalize their agreement for the sale of the property. (Exhibit P-234, Glenn dep. (2/24/97), pp. 97-18, 187); that during this period, GMH engaged in its due diligence efforts and arranged for financing (see Holloway N.T. (6/15/98), pp. 80, 92-94; exhibit P-116); that by August 30, GMH had essentially completed its due diligence and had completed its arrangement for financing; and that Prudential was aware that GMH was continuing to spend time and money to complete the transaction. (Glenn N.T. (6/17/98), p. 118.)

(43) Between May and August, the parties discussed generally the impact of the AHERF bond issue and ways around it, an "earn-out" concept relating to the AHERF transaction, and the amount of the capital adjustment. There were delays in working through these issues in late July and early August because of the

vacations of the various Prudential representatives and other business that Prudential was conducting unrelated to the Bala deal. (Glenn N.T. (6/23/98), pp. 243-44; Holloway N.T. (6/15/98), pp. 102-104; exhibit P-8.) The court finds Mr. Holloway credible when he testified that on August 12, Prudential rejected GMH's pricing proposal, which included an earn-out concept regarding AHERF and an implicit capital adjustment of $2.5 million. (Holloway N.T. (6/15/98), p. 116; Glenn N.T. (6/23/98), pp. 249-50.) In 1996, the management of AHERF wanted to find a site in the City Line Avenue area to consolidate various facets of its services, including a women's health center it referred to as its Center of Excellence. (McGoldrick N.T. (6/17/98), pp. 133-34; see also, Melvin N.T. (6/17/98), p. 8.) Although several sites were considered, Bala Plaza became the site of choice, in large part because of its location and the fact that it was an already existing property instead of new construction. (McGoldrick N.T. (6/17/98), pp. 135-36, 146.)

(44) The court finds Ms. McGoldrick credible when she testified that the plans for AHERF's lease transaction with GMH were proceeding smoothly until the bond issue arose in late May or early June; that she had planned on June 28, 1996 to present for board approval the parameters of the Bala proposal; that this essentially would be general approval for the outline of the project, which would then allow AHERF's management to pursue and refine the specifics of the Bala transaction. The court further finds Ms. McGoldrick credible when she testified that when the bond issue arose, on advice of counsel, the plan to go to the board for approval was suspended during the 90-day window; and that by September 11, the 90-day hold period had passed, and AHERF was ready to proceed. (McGoldrick N.T. (6/17/98), pp. 16, 133, 137-38, 140.)

(45) As discussed above, AHERF's management planned to purchase Bala Three East, including the land, and lease back the building. (McGoldrick N.T. (6/17/98), p. 154; Melvin N.T. (6/17/98), p. 14.) AHERF also wanted an option on Bala Three West. (McGoldrick N.T. (6/17/98), pp. 154-55.) The original purchase price for the land was $6,200,000. After the Government of Singapore Investment Corporation surfaced with the signing of the GSIC letter of intent dated September 12, 1996 and became involved, it appeared it would take more money to finalize the deal, and AHERF was willing to pay $7,200,000 for the land. (McGoldrick N.T. (6/17/98), pp. 155-56.)

(46) On October 17, 1996, Ms. McGoldrick presented the Bala proposal to the board, and it was approved. (McGoldrick, N.T. (6/17/98), pp. 151, 153, 156; exhibit P-172.)

## The Earn-out

(47) The court finds Mr. Holloway credible when he testified that various alternatives were considered by the parties to give Prudential assurances that AHERF would enter a lease once the 90-day window had passed. (Holloway N.T. (6/15/98), pp. 88-90, 95-96) and that one such alternative involved Prudential agreeing to take part of the purchase price as an "earn-out" to be paid when AHERF signed its lease. "The idea [was that GMH] . . . would close the deal with Prudential at an all-cash number minus the capital adjustment . . . and that at some point in the future when in fact the tenant (AHERF) could come back . . ., [Prudential] would be paid the extra differential at that point in time." (Holloway N.T. (6/15/98), p. 93.) The all-cash number originally contemplated was $103,000,000, with a $3,000,000 capital adjustment, and $3,250,000 as the earn-out. From early July until early August,

GMH waited for Prudential's response to the concept of the earn-out proposal, although there was some discussion regarding the cash portion of the earn-out proposal. In mid-July, GMH increased the cash offer to $103.5 million (with a downward adjustment to $2.5 million on the capital improvements number). On July 30, at Prudential's request GMH put the earn-out proposal in writing. Prudential then made a counterproposal requesting that "teeth" be put in the earn-out. By "teeth," Prudential wanted to be able to "get an additional bite at the apple of [GMH's] . . . profit" if and when AHERF came on board. That counterproposal was sent by Devon Glenn to GMH on the morning of August 12. GMH declined Prudential's counterproposal. Devon Glenn then took the earn-out concept as proposed by GMH to Prudential's investment committee, which, on August 12, rejected GMH's pricing proposal with the earn-out feature. (Holloway N.T. (6/15/98), pp. 94-114.)

### Capital Adjustment Negotiations

(48) The court finds Mr. Holloway credible when he testified that from the beginning of negotiations, the parties agreed that a capital adjustment was appropriate. (Exhibit P-8; Holloway N.T. (6/15/98), pp. 83-85; exhibit P-234, Glenn dep. (2/24/98), p. 131; exhibit P-11); that the capital adjustment discussions began with Prudential at $600,000 and GMH at $3,000,000; and that before the parties began to focus on an all-cash deal, Prudential was at $1,000,000 and GMH was at $2,500,000. (Holloway N.T. (6/15/98), pp. 83-85, 97, 108; exhibit P-8.)

### Prudential Begins Considering GSIC As a Potential Bidder for Property

(49) Without the knowledge of GMH, in June of 1996, while the property was "off the market" and

Prudential and GMH were negotiating toward finalizing the sale of the property, the Government of Singapore Investment Corporation ("GSIC") expressed an interest in the acquisition of the property. (Exhibit P-238, Whitmore dep. (4/25/98), pp. 86-87.)[5] (Grubb N.T. (6/19/98), pp. 12-13.) Further, on or around July 11, 1996, just a few days after Prudential extended the LOI with GMH, CB and Prudential began to discuss among themselves the possibility of selling the property to GSIC. (Exhibit P-234, Glenn dep. (2/24/97), pp. 134-35; see also, exhibit P-8 (handwritten note by Devon Glenn).) Prudential also considered entering into a direct transaction with AHERF. (Exhibit P-234, Glenn dep. (2/25/97), pp. 178-79.) These internal considerations were memorialized by Devon Glenn in a memo sent to members of the investment committee.

### Conference Call Regarding the Limit of Goldman Sachs' Participation

(50) Sometime in mid-July, the parties had a conference call where the limit of Goldman Sachs' participation in the Bala deal was discussed. (Holloway N.T. (6/15/98), pp. 105-106; Triece N.T. (6/23/98), p. 62; Glenn N.T. (6/23/98), p. 184.) The court finds Mr. Fascitelli credible when he testified that he told Mr. Glenn what Goldman was willing to contribute to the deal and that Prudential could terminate the deal if

---

5. Admissions of Glenn Whitmore from deposition testimony dated April 25, 1997 appear generally on pages 242 through 258 of the June 17, 1998 trial transcript. Mr. Whitmore's deposition transcript, with plaintiff GMH Associates' admission designations highlighted, was admitted as exhibit P-238. When referring to the admissions of Glenn Whitmore from this point on, the admissions will be identified by the deposition transcript page references, rather than the trial transcript page references.

it wished to do so; that he told Prudential that he was not speaking to the overall price GMH would pay for the transaction, but to the amount Goldman Sachs would contribute; that he stated that Mr. Holloway could bridge the gap if he wanted to do so; and that he told Prudential, "let's all think about it [and] . . . let us know what you want to do." After Mr. Fascitelli got off the conference call, Mr. Holloway told Mr. Glenn that Mr. Fascitelli was not driving the deal, that GMH still wanted to do the deal, that GMH had already put up additional funds and any more funds would have to come from GMH or the tenant. (Holloway N.T. (6/15/98), pp. 105-106; Fascitelli N.T. (6/19/98), pp. 49-52.)

(51) The court finds Mr. Fascitelli credible when he testified that Prudential did *not* terminate the deal, and never informed Mr. Fascitelli of other options it was pursuing. Prudential never notified Mr. Fascitelli that it was negotiating with anyone else, and Mr. Fascitelli learned about Prudential's negotiations with GSIC at around the time GSIC's letter of intent was signed (September 12, 1996). (Fascitelli N.T. (6/19/98), p. 52.)

*Prudential and CB Actively Reach Out to GSIC*

(52) On July 22, 1996, CB and Prudential contacted GSIC to explore GSIC's interest in the property. (Exhibit P-231, defendant's answers to plaintiff's first set of interrogatories to all defendants, answer to question no. 1; exhibit P-234, Glenn dep. (2/25/97), p. 134.) The court finds Mr. Glenn credible when he testified that Prudential did not tell GMH it was considering GSIC as a buyer or that it had approached GSIC. (Exhibit P-234, Glenn dep. (2/25/97), pp. 137, 168-69.)

(53) The court finds Mr. Holloway credible when he testified that in late July, Mr. Holloway expressed concern to Mr. Glenn about Prudential's delay in re-

sponding to GMH's earn-out proposal, which had then been on the table for several weeks. (See Holloway N.T. (6/15/98), pp. 102-104.) The court further finds Mr. Holloway credible when he stated that because he was concerned about the delay, Mr. Holloway asked Mr. Glenn:

"Are there any other players in this deal, is this deal still ours, to which he emphatically denied I was not negotiating with anybody, you're the only players, this deal is off the market, it's your deal." (Holloway N.T. (6/15/98), p. 109.)

The court further finds Mr. Holloway credible when he stated that Mr. Glenn told him that the delay in Prudential's response to the earn-out concept was due to "red tape" and peoples' vacations, and assured him again that Prudential was not dealing with anyone else, (Holloway N.T. (6/15/98), pp. 102-104), and at the time, Mr. Holloway believed Mr. Glenn was negotiating in good faith during the earn-out negotiations.

(54) The court finds Mr. Holloway credible when he testified that toward the end of the time period when the earn-out concept was being negotiated, in or around early August, Mr. Glenn suggested an all-cash number; that he recalled his response as follows:

"And I said Devon I have no problem with that [i]f the earn-out doesn't work[.] [L]et's go through the earn-out, we've been at this for five weeks now, let's get an answer on the earn-out. But if it doesn't work out, we can discuss an all-cash number, you know, what are we looking at? And clearly at this point in time, the number that was bandied about[,] and Devon made this statement[,] which was [']I feel at $106,750,000 that I could get this transaction done.[']" Prudential's Continuing Negotiations with GMH from August 12 Forward

(55) On August 12, 1996, the court finds Mr. Holloway credible when he testified that Mr. Glenn told him Prudential's investment committee had rejected the earn-out concept and the deal would have to be on an all-cash basis (Holloway N.T. (6/15/98), p. 114; Joseph N.T. (6/23/98), p. 78); that at the close of the call, Mr. Holloway said he needed some time to talk to his partners and put together an all-cash offer, and Mr. Glenn agreed. (Holloway N.T. (6/15/98), pp. 115-17.) The court further finds Mr. Holloway credible when he testified that Mr. Glenn assured him the deal was still GMH's, "as long as we are still communicating and negotiating." (Holloway N.T. (6/15/98), p. 117.) The court finds Mr. Joseph credible when he testified that he was told by Mr. Glenn about that August 12 call, and he understood that Devon Glenn had told Mr. Holloway that the earn-out concept was rejected and that if GMH was to continue negotiating, GMH would have to come back with an all-cash price. (Joseph N.T. (6/24/98), p. 79.)

(56) On or about August 12, 1996, however, Prudential and CB decided to give GSIC an "exclusive" opportunity to purchase the property. (Glenn N.T. (6/23/98), pp. 275-76; Joseph N.T. (6/24/98), p. 88.)

(57) The court finds Mr. Glenn credible when he testified that he did not think he needed to tell GMH about GSIC since, "in [his] mind," negotiations with GMH were terminated on August 12, 1996 (Glenn N.T. (6/23/98), p. 261); he admitted, however, that he never told GMH negotiations were terminated on that date, and Prudential continued to accept pricing proposals from GMH and to discuss those proposals with GMH. (Glenn N.T. (6/17/98), pp. 62-65, 91-94, 262-63; Triece N.T. (6/23/98), pp. 108-109; see also, Holloway N.T. (6/15/98), p. 117.)

(58) The court finds Mr. Holloway credible when he stated that no one from Prudential notified him that negotiations had ended. (Holloway N.T. (6/15/98), p. 117.)

(59) The court finds that Prudential sent a letter from Mr. Glenn to GSIC dated August 15, in which Mr. Glenn wrote, among other things:

"I understand from Glenn Whitmore [an employee of CB] that your firm will explore the potential acquisition of Bala Plaza. As I'm sure Glenn discussed with you, the property is currently off the market and Prudential is giving GSIC a limited exclusive look at this prominent four building complex." (Exhibit P-28.)

(60) The court finds that Prudential actively concealed from GMH that it was offering the property to GSIC (Exhibit P-234, Glenn dep. (2/25/97), p. 137) and that, even more, it was giving GSIC an "exclusive look." (Glenn N.T. (6/23/98), p. 276.) Nor did it tell GMH when, on August 21, 1996, GSIC representatives visited the property. (Joseph N.T. (6/24/98), pp. 86-87.) The court finds both Mr. Glenn and Mr. Joseph credible when they testified that they told Ms. Giuliani, an employee of Prudential's property management subsidiary, not to advise GMH about the GSIC visit. (Exhibit P-234, Glenn dep. (2/25/97), p. 186; Glenn N.T. (6/23/98), p. 230; Joseph N.T. (6/17/98), pp. 227-29; Joseph N.T. (6/24/98), pp. 83-84.)

(61) The court finds that Mr. Glenn and Mr. Joseph's instructions to Ms. Giuliani were made specifically knowing that there were two separate potential bidders for the property, neither of whom knew of the other. (Joseph N.T. (6/24/98), p. 82.)

(62) The court finds Ms. Giuliani credible when she testified that she felt uncomfortable about these twin

directives from Douglas Joseph and Devon Glenn not to tell Bruce Robinson about the foreign investor's visit.

(63) The court further finds Ms. Giuliani credible when she testified that "it seemed to me that [GMH and Prudential] were negotiating and they were preparing to consummate an agreement of sale. And what seemed odd is that you would have another investor come to the property, take a look at the property without at least saying to GMH at some point— . . . understand our letter of intent has expired. We're closing—you know, we're going to close our negotiations with you, and by the way we're reopening the offering of the property to other prospective buyers." (Giuliani N.T. (6/16/98), p. 232.)

(64) The court finds Ms. Giuliani credible when she testified that she was further instructed by Devon Glenn to give Joseph Grubb of Tower Realty whatever information he needed about the property and that she followed this directive. (Giuliani N.T. (6/16/98), pp. 236-37.)

(65) The court further finds Ms. Giuliani credible when she testified that from May 1996, when Devon Glenn informed her that Prudential and GMH had entered into a letter of interest (Giuliani N.T. (6/16/98), p. 226), Ms. Giuliani was instructed not to do any leasing with respect to any of the properties unless she ran the leases by Devon Glenn and Bruce Robinson and that she complied with this directive from the time GMH signed its letter of intent in May 1996 until the day the letter of intent was signed with GSIC in September 1996; she continued through that time to run leasing matters on all properties past Mr. Robinson. (Giuliani N.T. (6/16/98), pp. 226-27; see also, Holloway N.T. (6/17/98), pp. 28-29.)

(66) The court finds Mr. Glenn credible when he testified that his instruction to Ms. Giuliani to work closely with Bruce Robinson on the new leaseholds at Bala Plaza continued through June and July . . . didn't stop in August, did not stop on August 12, did not stop on August 15 when [Glenn] gave GSIC an exclusive look, didn't stop on August 30 when [Glenn] rejected the $105.5 and didn't stop when GMH was looking for a number at which they could purchase the property in the time frame of early September right after Labor Day. (Glenn N.T. (6/23/98), p. 272.)

(67) The court finds Ms. Giuliani credible when she testified that she has a specific recollection that some time in late August, she reviewed with Bruce Robinson a leasing transaction involving Prime Star, a current large tenant, at the same time she was providing some information to Joseph Grubb, and that when she told Devon Glenn she was uncomfortable with this situation, he reiterated that she was still *not* at liberty to tell Bruce Robinson that Prudential was negotiating with GSIC. (Giuliani N.T. (6/16/98), pp. 237-38.)

(68) The court finds Mr. Holloway credible when he testified that he called Doug Joseph on August 23 to ask about the status of GMH's August 16 proposal; that Mr. Joseph told him the delay was due to people being away on vacation; and that Mr. Holloway asked if they were "shopping" GMH's deal and Mr. Joseph replied, "absolutely not." (Giuliani N.T. 6/16/98, pp. 11-12, 238.)

(69) The court finds that in late August, CB and Prudential were waiting for GSIC's bid so it could be compared to GMH's August 16 proposal. On August 27, 1996, Mr. Joseph and Mr. Whitmore sent a memo to Mr. Glenn, stating:

"We will have GSIC's offer by the end of the week (hopefully sooner) however, given the time delay we should be prepared to consider both proposals from GMH and GSIC and respond accordingly by Friday." (Exhibit P-29, (8/27/96).)

(70) The court finds Mr. Fascitelli credible when he testified that at about the same time that Mr. Holloway was seeking assurances from Doug Joseph, Mr. Fascitelli shared with Mr. Holloway that he had heard rumors in August that Prudential was talking to other people. Since the telephone conversation in which Mr. Fascitelli had asked Prudential to "let us know" if it had another offer, GMH, Whitehall and Prudential had been continuing to negotiate and structure a solution to the AHERF situation. (Fascitelli N.T. (6/19/98), pp. 54-55, 59.)

(71) The court finds Mr. Fascitelli credible when he testified that he asked Mr. Triece in August 1996 whether anyone else was looking at the property, and Mr. Triece was evasive. (Fascitelli N.T. (6/19/98), pp. 54-55.) The court finds Mr. Triece credible when he testified that despite taking the position that the parties were not negotiating in late August, he understood by these messages that Mr. Fascitelli was "trying to figure out if we were going to counter at a higher price, if we were going to reject him outright, if we were going to consider other alternatives"; that although that was Mr. Triece's understanding, he never said to Mr. Fascitelli, "Mike, why are you talking to me about a transaction that's over," because Mr. Fascitelli did not "specifically" ask a "question like that." (Triece N.T. (6/23/98), pp. 99, 102.) The court further finds Mr. Fascitelli credible when he testified that in response to his concerns, Mr. Holloway told him that he had spoken to Mr. Glenn and that Mr. Glenn had assured

him that there were no competing bidders to the property. (Fascitelli N.T. (6/19/98), pp. 54-59.)

(72) The court finds Mr. Holloway credible when he testified that on August 30, he called Devon Glenn to check on the status of GMH's August 16, 1998 all-cash proposal; that at that time, Devon Glenn told him that Prudential was rejecting GMH's proposal; that he was bewildered and questioned Devon Glenn as to how that could have happened after Devon Glenn had previously told him that $106,750,000 was a number at which he thought he could get the deal done. GMH's net number was actually greater than $108,000,000 when the TIBCs were added in. (Holloway N.T. (6/16/98), pp. 13-14; Glenn N.T. (6/23/98), pp. 284-85, 294-95.)

(73) The court further finds Mr. Holloway credible when he testified that on August 30, 1998, he then asked Devon Glenn where GMH stood and asked for a counteroffer from Prudential; that Mr. Glenn responded that Prudential did not give counteroffers; that he then told Mr. Glenn he wanted a number at which Prudential would agree to sell the property; that Devon Glenn said he thought he could probably get a number by Tuesday, to which Mr. Holloway responded that he might not even want a number, because he was so disgusted; and that the conversation ended when Mr. Holloway told Devon Glenn that he would get back to him to let him know whether he wanted a number. (Holloway N.T. (6/16/98), pp. 14-15.)

(74) The court finds Mr. Holloway credible when he testified that during the August 30 conversation, he asked Devon Glenn if Prudential was talking to anyone else; that Devon Glenn responded that the property was off the market, it was GMH's deal, Prudential had not talked to anyone else, had not shown the build-

ings to anyone, had not discussed the deal with anyone, and was not negotiating with anyone else. (Holloway N.T. (6/16/98), pp. 15-16.)

(75) The court finds Mr. Holloway credible when he testified that after his call with Devon Glenn, he immediately called Mr. Joseph of CB Commercial; that he reiterated to Mr. Joseph the conversation he had just had with Devon Glenn, and asked Mr. Joseph, "[H]ave you guys been shopping us? . . . It doesn't smell right to me"; that Mr. Joseph responded that they were not "shopping" GMH and that nobody is "involved in this transaction but you"; that he then told Mr. Joseph that he would call back on Tuesday, September 3, 1997 (since Monday was the Labor Day holiday) to let him know whether GMH wanted a number. (Holloway N.T. (6/16/98), pp. 16-17.)

(76) The court finds Mr. Holloway credible when he testified that on September 3, 1996, he called Mr. Joseph at his office; that during this call, he asked whether the number was going to be $106,750,000, and Doug Joseph responded that he thought the number "had moved north of $107,000,000"; that when Mr. Holloway questioned him as to why the number was higher, Doug Joseph told him activity in the marketplace was supporting a higher price; that Mr. Joseph stated that they were not discussing the property with other buyers, but they were "hearing rumors"; that he then stated that he wanted a price at which Prudential would sell the property; that Doug Joseph said that Prudential would not counter, and he responded that he did not want a counter, but a "price that Prudential will agree to sell me the building"; and that Doug Joseph said that he understood. (Holloway N.T. (6/16/98), pp. 16-18.)

252

(77) The court finds Mr. Holloway credible when he testified that on Thursday, September 5, 1996, he again spoke to Doug Joseph to ask him where the deal stood; that Mr. Robinson was also on the phone during this conversation; that he asked Mr. Joseph again for a number, to which Mr. Joseph responded:

"I talked to Devon. Devon's very apologetic. As you know, people are away. We're having a problem getting a price for you, you know."

The court further finds Mr. Holloway credible when he testified that Mr. Joseph told him and Mr. Robinson that Devon Glenn expected to talk to Mr. Triece and Mr. Twardock the next day and was hopeful that he would be able to get back to them with a number the next day. (Holloway N.T. (6/16/98), pp. 18-19; Robinson N.T. (6/18/98), 116-17.)

(78) The court further finds Mr. Holloway credible when he testified that on Friday, September 6, 1996, he and Mr. Robinson called Doug Joseph to ask where Prudential's number was. Doug Joseph again stated that Devon Glenn was very apologetic, but that Dave Twardock was away. Mr. Joseph also told Mr. Holloway and Mr. Robinson that Mr. Twardock and Mr. Triece were expected in that day, and that he would definitely have a number on Monday at which Prudential would agree to sell GMH the property. Mr. Joseph set up a conference call for Monday. In response, Mr. Holloway stated that he wanted to get this done, that everything, including the due diligence, was done, and that GMH was "ready to go." (Holloway N.T. (6/16/98), pp. 19-21; Robinson N.T. (6/18/98), pp. 117-18.)

(79) The court finds Mr. Holloway credible when he testified that neither on September 3 nor September 5 did Devon Glenn or Doug Joseph tell Mr. Holloway that the Government of Singapore had tendered an offer

for the purchase of the Bala properties on August 30. (N.T. (6/16/98), p. 19.) The court further finds Mr. Holloway credible when he testified that at no time during the conversation of September 6 did Mr. Joseph tell Mr. Holloway or Mr. Robinson about the two written offers that had come in from the Government of Singapore on August 30 or September 6. (Robinson N.T. (6/18/98), p. 117; Holloway N.T. (6/16/98), pp. 19, 26.)

(80) The court finds Mr. Holloway credible when he testified that during one of his phone calls with Doug Joseph on either September 5 or 6, he told Doug Joseph that he was going to be away in Utah the following week, but that Mr. Robinson would be in the office on Monday to receive a phone call from either Devon Glenn or Doug Joseph; that Doug Joseph told him that this would not be a problem; and that he left for Utah on Sunday, September 8, 1996. (Holloway N.T. (6/16/98), p. 23.)

(81) The court finds Mr. Holloway credible when he testified that before leaving for Utah, he told Mr. Robinson that, based on his conversation with Doug Joseph and Devon Glenn, he believed the price would be "shaking out" at $106,750,000; that he told Mr. Robinson that he thought Doug Joseph and Devon Glenn had said that they were going north of 107, but that Mr. Robinson had "permission that at $106,750,000 he could accept the deal right then." (Holloway N.T. (6/16/98), pp. 23-24.)

(82) The court finds Mr. Robinson credible when he testified that previously, on August 12, Mr. Holloway and he had spoken with Devon Glenn about the possibility of an all-cash offer, and Devon Glenn had told them that, "$106,750,000 would be an all-cash offer that he felt 95 percent sure he could get approved."

(Robinson N.T. (6/18/98), p. 118; Holloway N.T. (6/15/98), p. 116.)

(83) The court finds Mr. Robinson credible when he testified that on September 9, 1996, in the early afternoon, he received a conference call from Doug Joseph and Devon Glenn; that after exchanging pleasantries, Devon Glenn told him that, with respect to pricing, "if we were to offer you a price of $108 million, then you would say it is too expensive and decline. If you were to offer us a price of say $106 million, then we would think it was too low and we would decline and so we have a difference and what should we do with that?"; that he responded that he believed they could overcome the difference, and asked, "what about the $106,750,000 that we had previously discussed that you were 95 percent sure that you could get approved? If that was the number on the table, would we have a deal?"; that Devon Glenn responded that he felt that the market had moved since that time and that that was no longer an acceptable number; that when he then asked what number would be acceptable, Devon Glenn said $107,250,000 was the number he could close at. (Robinson N.T. (6/18/98), pp. 118-20.)

(84) The court further finds Mr. Robinson credible when he testified, during the September 9, 1996 conference call, that he then stated that he was not saying that GMH could not offer a lower number and that Prudential would not accept the lower number, but that if he wanted to make sure that GMH got the property, he must offer the $107,250,000 because that was the number Devon Glenn knew he could get the deal approved at; that he further asked:

"[H]ow do I know that this isn't a moving target? How do I know that we're not going to offer $107,250,000 and you're going to come back a week

later and tell us the number is now $108 million?" (Robinson N.T. (6/18/98), p. 120; see also, Holloway N.T. (6/16/98), p. 25); and that Devon Glenn responded that "this is not a moving target, this is our number that we will sell the property to you for." (Robinson N.T. (6/18/98), p. 121.)

(85) The court finds Mr. Robinson credible when he testified that he ended the call on September 9 feeling that although the number was higher than GMH had wanted to pay, they finally had a number that they could buy the property for if they wanted it; that he spoke with Mr. Holloway in Utah on the night of September 9, 1998 to update him on the day's events, and they decided that they would talk about a response to Prudential's price the next day. (Robinson N.T. (6/18/98), p. 121.)

(86) The court finds Mr. Robinson credible when he testified that during his conversation with Doug Joseph on either September 9 or 10, Doug Joseph told him that GMH's next offer had to be in writing. (Robinson N.T. (6/18/98), p. 122.)

(87) The court further finds Mr. Robinson credible when he testified that on September 10, 1996, Mr. Joseph called him and asked where GMH was, why hadn't he and Mr. Holloway talked, and if he was going to talk to Mr. Holloway soon; that Mr. Joseph seemed "antsy." (Robinson N.T. (6/18/98), p. 122.)

(88) The court finds Mr. Robinson credible when he testified that approximately 15 minutes after the telephone call on September 10, 1996, Mr. Joseph called back and told him that there were three people interested in the property and he was concerned they were going to put in bids on the property; that he asked Doug Joseph how anyone else could be bidding on the property when GMH was told there was nobody else negotiating,

and Mr. Joseph did not respond; that he asked if one of the parties was Cali Realty, and Mr. Joseph responded that Cali was not the one that concerned him; that when he asked who concerned him, Mr. Joseph responded that he had taken a large international buyer through the property at the end of August and he believed they were going to bid for the property; that Mr. Joseph then told him that it was really important that GMH put its best offer on the table if it wanted to get the property; and that Mr. Joseph did not disclose to Mr. Robinson that the foreign investor had already bid twice on the property. (Robinson N.T. (6/18/98), pp. 123-24.)

(89) The court finds Mr. Robinson credible when he testified that on September 10, 1996, after this second call from Mr. Joseph, he called Janet Giuliani to ask about the large international buyer; that Ms. Giuliani was upset and said she had wanted to tell him about the visit, but Devon Glenn had told her not to; and that Ms. Giuliani told him that:

"Devon Glenn told me I'm not allowed to tell you. He told me that you guys knew that there was competition for the property. I didn't think there was, but I feared for my job, you know, I felt that I had an obligation to my employer"; and that when Mr. Robinson asked again, Ms. Giuliani finally revealed that the Government of Singapore had toured the building. (Robinson N.T. (6/18/98), pp. 125-27; Giuliani N.T. (6/16/98), pp. 240-41.)

*GMH and AHERF Strike a Deal*

(90) The court finds Mr. Holloway credible when he testified that during the week of September 3, 1996, he received a call from AHERF scheduling a meeting for September 11, 1996; that he believed AHERF was close to the end of its 90-day window, and thought

that was the reason for the September 11, 1996 meeting, but he was not positive. (Holloway N.T. (6/16/98), p. 21.)

(91) The court further finds Mr. Holloway credible when he testified that before the morning meeting with AHERF, he and Mr. Robinson agreed between themselves that they would meet Prudential's "will sell" price; that is, "give them the price that they say which is $107,250,000." (Holloway N.T. (6/16/98), pp. 33, 183; Robinson N.T. (6/18/98), p. 127.)

(92) In attendance at the September 11, 1996 meeting were Mr. Robinson, Mr. Holloway, Dr. Kaye, Margaret McGoldrick, Thomas Melvin and Matt Dowling. (Robinson N.T. (6/18/98), p. 128; Melvin N.T. (6/17/98), p. 18.) The court finds Mr. Robinson credible when he testified that he and Mr. Holloway started the meeting by telling AHERF that GMH had a deal with Prudential, that GMH and Prudential had agreed to a price, and GMH was moving toward closing; that although at the time of the AHERF meeting they had not actually transmitted the requested written response to Prudential as of the time of the meeting, but GMH had decided to commit to the $107,250,000 price. (Robinson N.T. (6/18/98), pp. 127, 129; Melvin N.T. (6/17/98), p. 18.)

(93) The court finds Mr. Robinson credible when he testified that at the meeting with AHERF, "Allegheny basically told us that they have a deal with us in principle, however there's some issues that they'd like to discuss with us"; that none of the issues that Allegheny wanted to discuss "were viewed by either side as material in completing the transaction"; that these issues involved clarification from GMH on when GMH would be able to put tenants into the Bala buildings and whether GMH was able to give Allegheny an additional $10 allowance for tenant improvement. (Robinson N.T. (6/18/98), pp.

129-30; see also, McGoldrick N.T. (6/17/98), p. 151; Melvin N.T. (6/17/98), pp. 24-25.)

(94) The court finds Mr. Melvin credible when he testified that when he walked away from the September 11 meetings, he believed that AHERF and GMH had a deal; and that there were "no significant open issues at the culmination of the September 11 meeting." (Melvin N.T. (6/17/98), pp. 25-27.)

### GMH Meets Prudential's "Will Sell" Price

(95) The court finds the testimony of Mr. Robinson credible when he testified that on September 11, 1996, after the AHERF meeting, he called Doug Joseph to tell him that the full price of $107,250,000 was acceptable, and that he would put it in writing to him later that day; that Doug Joseph suggested the writing should be just "like a letter of intent format." The court further finds Mr. Robinson credible when he testified that GMH's September 11 letter was "[GMH's] acceptance of the $107,250,000 price"; that GMH used the LOI format because Mr. Joseph requested it, because there had been numerous references to the May 13 LOI and because the May 13 LOI addressed details including who was responsible for the brokers' commissions and tenant improvements. GMH, therefore, tried to "piggy-back . . . off that document." (Robinson N.T. (6/18/98), pp. 130-31; exhibit P-34.)

(96) The court finds the testimony of Mr. Robinson credible when he testified that he sent a draft of the acceptance letter to Doug Joseph first for his review and that Joseph told them it looked great and could be sent to Prudential. (Robinson N.T. (6/18/98), p. 131.)

(97) The court finds Mr. Robinson credible when he testified that with this September 11 letter, there were no material outstanding issues between the parties;

that while the letter referred to an environmental question, GMH had removed that as a pricing issue; and that the purpose of identifying the question was that he wanted to make sure Prudential realized GMH had to have some closure with it and GMH would have Prudential's cooperation in getting it resolved. (Robinson N.T. (6/18/98), pp. 131-32.)

(98) The court finds that throughout the parties' negotiations, the price agreed upon in the May 13 LOI—$109,250,000—did not change. What was being negotiated was whether part of the price would be paid by means of an "earn-out" and, in addition, the extent of capital adjustments to the agreed upon price. (Exhibit P-234; Glenn dep. (2/24/98), pp. 102-103.)

(99) The court finds that the ultimate "will sell" price of $107,250,000 which was provided by Prudential and CB, was an all-cash price which took into account the previous negotiations concerning capital adjustments.

(100) The court finds Mr. Holloway credible when he testified that had he known that there was another bidder, he would have sat down immediately with Mr. Glenn and closed the deal; he would have "immediately brought Devon Glenn in and sat him down and said, tell us exactly what has to be done in this deal. There's no way in hell we would allow ourselves to be stalking horse at that point. We had been in this deal for five or six months. Everything was done. The financing was in place. The equity was in place. Our tenant was in place. I mean there's no way in hell—we would have closed that deal, and we would have brought him right down to the point of where he had to be on a price structure and closed it." (Holloway N.T. (6/15/98), p. 56; see also, Holloway N.T. (6/16/98), p. 221.)

(101) The court finds that from late July until September 12, while the above negotiations with GMH

were proceeding, Prudential and CB were pursuing a parallel track with GSIC. Prudential and CB actively concealed these parallel tracks from both GSIC and GMH in order to use these suitors for the property as pawns against one another in a scheme to drive up the purchase price of the property, all for the gain of CB and Prudential.

### GSIC's Negotiation and Acquisition of Bala

(102) Tower Realty Management Corporation is an asset management company that is a wholly owned affiliate of the Government of Singapore Investment Corporation. (Grubb N.T. (6/18/98), p. 9.)

(103) The court finds Mr. Whitmore credible when he testified that late in July, he was instructed by Devon Glenn to call Tower Realty's Joseph Grubb, the regional asset manager for GSIC's northeast region (Boston through Virginia), to determine if GSIC would be interested in Bala Plaza. (Exhibit P-238; Whitmore dep. (4/25/98), pp. 86-89.)

(104) The court finds Mr. Whitmore credible when he testified that Mr. Grubb told him that GSIC was "very, very interested" in the property, but that he understood that the property was under an agreement with GMH, and therefore, off the market; he told Mr. Grubb that negotiations with GMH were not going smoothly. (Grubb N.T. (6/18/98), pp. 16-18.)

(105) The court further finds Mr. Grubb credible when he testified after speaking with Glenn Whitmore, he had a conference call with Paul Gamelin, his superior at Tower; that during the conference call, Mr. Grubb stated that GSIC had a high level of interest; that it was very important for them to have an "exclusive look"; that they would go forward and put their time into reviewing the asset if they got exclusivity; and

that it was important to GSIC to have an "exclusive look," to know that they "wouldn't have a competitor," so they would not be used as a "stalking horse." (Grubb N.T. (6/18/98), pp. 20-23.)

(106) The court finds Mr. Grubb credible when he testified that during the phone conference on or about August 15, 1996, and in a subsequent August 15 letter from Devon Glenn, Prudential assured him that GSIC would have an exclusive opportunity regarding Bala. (Grubb N.T. (6/18/98), pp. 24-26; exhibit P-128.)

(107) The court finds Mr. Grubb credible when he testified that on August 21, he toured the property for GSIC. (Grubb N.T. (6/16/98), p. 25.)

(108) The court further finds Mr. Grubb credible when he testified that from GSIC's receipt of the August 15 letter up through and including GSIC's visit to the Bala property on August 21, no one from Prudential or CB Commercial told any representative of GSIC that GMH had made an all-cash offer on August 16. (Grubb N.T. (6/18/98), p. 26.)

(109) The court finds Mr. Grubb credible when he testified that he relied on Prudential's promise of exclusivity, and that it was inconsistent for Prudential to entertain an offer from GMH during this time period. (Grubb N.T. (6/18/98), p. 26.)

(110) The court finds Mr. Grubb credible when he testified that when GSIC submitted its August 30 offer of $108,500,000, it used its standard letter of intent, which included a provision that the tenant improvements and the brokers' commissions would be paid by the seller, and a provision that the LOI would not be construed as a final agreement. (Grubb N.T. pp. 28-33; exhibit P-30.)

(111) The court finds Mr. Grubb credible when he testified that he was not made aware of pricing conversations between Devon Glenn, Doug Joseph, Bruce Robinson and Gary Holloway on September 3, 5 and 6, after GSIC's August 30 bid. (Grubb N.T. (6/18/98), p. 36.)

(112) The court further finds Mr. Grubb credible when he testified that Devon Glenn asked that certain revisions be made to the language of GSIC's August 30, 1996 letter of intent; that GSIC submitted a revised letter of intent on Friday, September 6, 1996, which incorporated Devon Glenn's changes; and that this September 6, 1996 LOI still contained a $108,500,000 offer, a provision that the seller would be responsible for tenant improvements and brokers' commissions, and a provision that the LOI could not be construed as a final sale agreement; and that GSIC expected, and had discussed with Prudential, that Prudential was to sign the LOI on Monday, September 9, 1996. (Grubb N.T. (6/18/98), pp. 33-37; exhibit P-31.)

(113) The court finds Mr. Grubb credible when he testified that when he still had not received a signed letter of intent by September 11, he began to get nervous and contacted Devon Glenn and Glenn Whitmore to see why there was a delay; Mr. Whitmore told him that Prudential was reviewing the offer and that it was "going through channels"; he was not made aware that on September 9, Devon Glenn had given GMH a "will sell" price or that on September 10, Mr. Joseph had contacted GMH twice to make sure that GMH made its best offer in keeping with the "will sell" price or that Prudential was waiting for GMH's response to the September 9 call. (Grubb N.T. (6/18/98), pp. 38-40.)

(114) The court further finds Mr. Grubb credible when he testified that early on the morning of September

12, he and Mr. Glenn spoke by telephone; that Mr. Glenn told him during that conversation that "GMH had made an 'unsolicited offer' and that it was 'a higher net number' than GSIC's offer." [6] (Grubb N.T. (6/18/98), pp. 41-42, 67; exhibit P-139.) The court finds that GMH's September 11 pricing proposal was not an "unsolicited" offer in that both Mr. Joseph and Mr. Glenn were waiting for GMH to respond to the September 9 conference call; in fact, Mr. Glenn conceded that the reason Prudential was not signing GSIC's proposed LOI on September 9, 10 or 11 was that Mr. Glenn was waiting for GMH's response to the September 9 conference call and Prudential's $107,250,000 number. (Glenn N.T. (6/23/98), pp. 293-94.) Mr. Glenn told Mr. Grubb, however, that Prudential would "still honor [GSIC's] . . . exclusive"; that Mr. Glenn further told him that if GSIC agreed to pay for tenant improvements and brokerage commissions ("TIBCs") in the amount of $806,158, then Prudential would sign an LOI with GSIC, and GSIC agreed, which made its offer approximately $500,000 more than GMH's number, including TIBCs. (Grubb N.T. (6/18/98), pp. 43, 47; Glenn N.T. (6/23/98), pp. 284-85, 295.)

(115) The court finds Mr. Grubb credible when he testified that the final GSIC LOI executed by Prudential dated September 12, 1996, provided that GSIC would pay for the tenant improvements and brokers' commissions, and it also contained similar language to the

6. The reason GMH's $107.25 million number was a higher net number than GSIC's $108.5 million number was because, in its LOI, GMH agreed to pay tenant improvements and brokers' commissions, which were $1.6 million. GSIC had no such provision in its offer. Therefore, comparing "apples to apples," GMH's number was $107.25 plus $1.6 million, or $108,850,000, and GSIC's was $350,000 less. (See N.T. 6/23/98 (Glenn), pp. 294-95.)

May 13, 1996 GMH LOI with the need regarding final approvals. (Grubb N.T. (6/18/98), p. 53; exhibit P-35; exhibit P-14.)

(116) GSIC's September 12, 1996 LOI was executed by "Devon Glenn, vice president," on behalf of The Prudential Insurance Company of America. (Grubb N.T. (6/18/98), p. 54; exhibit P-35.)

(117) The court finds Mr. Grubb credible when he testified that GSIC's 60-day due diligence period expired on or about November 11 or 12, but there were no written extensions of the letter of intent; that Devon Glenn provided verbal extensions of the LOI until GSIC's closing in late December could occur; and that the purchase and sale agreement between GSIC and Prudential was not executed until the day of closing, December 26, 1996. (Grubb N.T. (6/18/98), pp. 55-56.)

(118) The court finds Mr. Holloway credible when he testified that on September 12, he and Mr. Robinson were informed by Devon Glenn and Doug Joseph that Prudential had rejected GMH's $107,250,000 number and was awarding the deal to GSIC. (Holloway N.T. (6/16/98), pp. 43-45; see also, Robinson N.T. (6/18/98), pp. 133-34.)

(119) Mr. Holloway expressed disbelief about Prudential's earlier representation that Prudential and CB were negotiating only with GMH and queried how an agreement with GSIC could be consummated so quickly. (Holloway N.T. (6/16/98), pp. 43-45; Robinson N.T. (6/18/98), pp. 133-34.) Mr. Glenn responded that the negotiations with GSIC had only just evolved "within the last 24 hours." (Exhibit P-244; Glenn dep. (2/24/98), p. 302; see also, Holloway N.T. (6/16/98), pp. 43-45; Robinson N.T. (6/18/98), pp. 133-34.) The court finds that Mr. Glenn and, in fact, Prudential had been having

discussions with GSIC for nearly a month. (Glenn N.T. (6/23/98), p. 302.)

(120) The court finds that the LOI with GSIC contained language to the effect that the LOI was not a final agreement, but, nonetheless, Prudential believed the GSIC LOI committed Prudential to consummating the transaction with GSIC. (Grubb N.T. (6/18/98), p. 53; exhibit P-35; Triece N.T. (6/17/98), pp. 203-204.) No purchase and sale agreement was ever executed until the GSIC-Prudential transaction closed in late December 1996. (Grubb N.T. (6/18/98), p. 56.)

(121) The court finds Mr. Triece credible when he testified that when GMH threatened litigation based on its belief that it had consummated an agreement to purchase the property, Prudential agreed to approach GSIC about "unwinding" the GSIC-Prudential LOI. (Triece N.T. (6/23/98), pp. 203-204.)

(122) The court finds that there was no evidence Prudential's board met before Mr. Glenn signed GSIC's LOI, and GSIC and Prudential did not execute a purchase agreement or any other legal document other than the LOI until their transaction closed in late December 1996; after September 12, Prudential insisted, nevertheless, that its deal with GSIC could not be unwound unless GSIC were paid a "breakup" fee and agreed to step aside. (Grubb N.T. (6/18/98), p. 56; Triece N.T. (6/17/98), pp. 203-204; Glenn N.T. (6/18/98), pp. 112-13.) The court finds Mr. Glenn credible when he testified that Prudential was "under agreement with GSIC," but agreed "as a courtesy" to ask GSIC to accept a breakup fee so that GMH "could then step back in." (Exhibit P-234; Glenn dep. (2/24/98), p. 298.) The court finds Mr. Triece credible when he testified that GSIC would expect a breakup fee, "because of our relationship with them and the fact that Devon [Glenn] had told him

that he was going to recommend their deal to Prudential and that Devon had told them that Prudential was going to work with them to try and see if we couldn't close the transaction." (Exhibit P-235; Triece dep. (3/18/97), p. 187.)

(123) The court finds that the bases Prudential has cited for considering itself bound to GSIC thus consist of oral assurances made by Mr. Glenn and an LOI signed by Mr. Glenn, without the formalities it now insists were a prerequisite to a binding agreement with GMH.

### Findings Regarding Expert Testimony: Michael Fascitelli

(124) The court qualified Michael Fascitelli as an expert in the field of real estate transactions, real estate trusts and the type of custom and practice in the business entailed in a transaction such as that under consideration at this time. (Fascitelli N.T. (6/19/98), p. 26.) From 1985 to 1996, he was with Goldman Sachs, one of the largest investment banking firms in the United States (or the world). He was a general partner from 1992-1996, became co-head of the real estate department in 1990, and became sole head of real estate investment banking in 1992. He was also a founding member and a member of the investment committee for the Whitehall Fund, a vehicle for Goldman Sachs' real estate transactions, including its transaction with GMH. He is also associated with other major real estate associations. (Fascitelli N.T. (6/19/98), pp. 8, 10-13.)

(125) The court finds Mr. Fascitelli credible when he testified that he has been involved in many real estate transactions in which Goldman Sachs represented Prudential Realty as an agent, broker and advisor; sometimes he was a team leader in such transactions, and

sometimes he supervised other people. (Fascitelli N.T. (6/15/98), pp. 26-29.)

(126) The court further finds Mr. Fascitelli credible when he testified that he has also been involved in transactions in which he was on the opposite side of the table from Prudential, *i.e.*, buying a property from Prudential. The relationship with Prudential was an important one for Goldman Sachs, and the value of the transactions was in billions of dollars. (Fascitelli N.T. (6/19/98), pp. 26-29.)

(127) The court finds Mr. Fascitelli credible when he testified that he is familiar with the language used in paragraph 8(b) of the LOI between GMH and Prudential, namely:

"(b) *Not binding.* Notwithstanding That Either Or Both Parties May Expend Substantial Efforts And Sums In Anticipation Of Entering A Contract, The Parties Acknowledge That In No Event Will This Letter Be Construed As An Enforceable Contract To Sell Or Purchase The Property And Each Party Accepts The Risk That No Such Contract Will Be Executed;" (Exhibit P-14; paragraph 8(b)); this language is commonly used in real estate transactions, both by Prudential and by the industry, generally. (Fascitelli N.T. (6/19/98), p. 64.)

(128) The court finds Mr. Fascitelli credible when he testified that notwithstanding the inclusion of such a provision in an LOI, it is standard practice in the industry to consummate a transaction based on an oral agreement and a handshake; most of the transactions in which Mr. Fascitelli was involved with Prudential were consummated by oral communications—"the rule is when you agree to a transaction, you finished it. I mean most of the cases, the [v]ast majority." (Fascitelli N.T. (6/19/98), pp. 65-66.)

(129) The court finds Mr. Fascitelli credible when he testified that before agreeing to take on GMH as a partner, Whitehall and Goldman Sachs performed a substantial amount of work to check out Mr. Holloway and understand his aspirations, his qualifications and his organizational capabilities. (Fascitelli N.T. (6/19/98), pp. 66-67.)

(130) The court further finds Mr. Fascitelli credible when he testified that Mr. Holloway explained to him that he had been operating in the local Philadelphia market and had become involved in certain transactions with General Electric, a big national player; that he was seeking to develop a large portfolio of suburban properties and use it either to go public or form a private REIT; that his goal was to become a participant in the national real estate market; that in order to do so, it was necessary for him to interest national players, such as Goldman Sachs, Morgan Stanley and Prudential, in offering him properties; that to get on such entities' lists of prospective buyers, one needs a track record, "a status or reputation of doing large transactions and doing them with quality sellers and quality buyers." (Fascitelli N.T. (6/19/98), pp. 67-69.)

(131) The court finds Mr. Fascitelli credible when he testified that failure to close a $100 million-plus transaction has a negative impact on the ability to move from a regional market participant to a national market participant; that the real estate business is based on reputation and track record; that failure to close a deal affects the ability to get offering materials and, even more, makes people reluctant to award a deal; and that "[O]ffered another choice, you would probably not seek to do business with that buyer." (Fascitelli N.T. (6/19/98), pp. 70-71.)

*Evidence Supporting GMH's Expert,*
*Wayne Geisser's, Analysis of Lost Profit*

(132) Mr. Geisser relied on certain facts and assumptions derived from the trial record. The court finds Mr. Geisser's reliance reasonable, and the following trial evidence that he relied upon to be credible and well-supported.

*General Market Information*

(133) Mr. Geisser relied, in part, on the testimony of Mr. Robinson, who is a CPA, and is responsible at GMH for the acquisition and disposition of properties, capital transactions and financing relating to these activities. Additionally, as part of his job, it is important for Mr. Robinson to follow the real estate market including its trends, acquisitions and dispositions. (Robinson N.T. (6/18/98), pp. 141-42.)

(134) For the acquisition or disposition of property, it is necessary to have specific information about the market in order to understand pricing. In general, currently, the suburban office market is extremely strong nationally, and more specifically, the Philadelphia suburban office market is extremely strong. (Robinson N.T. (6/18/98), pp. 142-43.)

(135) In Mr. Robinson's experience, there has been a lot of activity with Real Estate Investment Trusts ("REITs") in the Philadelphia marketplace within the last 12 months, both central business district properties and suburban office properties, and as a result, pricing in this marketplace has increased dramatically. (Robinson N.T. (6/18/98), pp. 144-45.)

(136) There are a number of ways to value property. Of these, two are pertinent to the analysis here. They are capitalization ("cap") rate analysis and a market

value approach. (Robinson N.T. (6/18/98), pp. 147-48, 154.) The court in this matter has chosen to use the "cap" rate analysis since it is supported by competent evidence in the record.

(137) A cap rate is a multiple on a property's earnings. In valuing a property, one would take the net operating income of a property and apply the cap rate. Cap rate is inverse to market value, *i.e.,* the lower the cap rate, the higher the market value. Recently, cap rates and market value rates have begun to decouple. In certain situations, where a property would not have been sold previously because the income stream was too low and the owner of the property might not be willing to sell for that price, a buyer such as a REIT is willing to look past the cap rate value. The REIT is willing to accept a much, much lower cap rate because they are viewing the replacement costs of the property. The impact of this is that it allows more transactions to occur because buyers are now willing to pay more for properties. (Robinson N.T. (6/18/98), pp. 148, 150, 153.)

(138) With respect to using the market value approach to establish a property's value, the value of the property is taken and divided by the amount of rentable square footage in that building to arrive at a price per square foot. Price per square foot valuation is used to cost the construction of new buildings and to compare the replacement cost of an existing building. (Robinson N.T. (6/18/98), p. 154.)

*The Bala Transaction*

(139) With respect to the Bala properties, financing was to be supplied by Goldman Sachs and GE Capital. Goldman was to be GMH's equity partner and GMH was to put up no less than 10 percent of the equity. GMH projected that a 10 percent equity contribution

and the initial capital contribution would have amounted to $2.89 million. On the day of closing, upon the sale of Bala Three East to AHERF and the receipt of GMH's brokerage fee for the deal, GMH would have received back $2.3 million at closing. GMH's net cash investment, therefore, at the end of the day of closing would have been $500,000. Following the closings with Prudential and sale of the bondable lease, the GMH/Whitehall partnership would have realized approximately $20 million to be distributed pursuant to the partnership agreement. (Robinson N.T. (6/18/98), pp. 155-56, 158, 161-62.)

(140) With a purchase price of $107,250,000, the Bala Three East transaction with AHERF would yield the following:

(a) the total proceeds from the sale of the Bala Three transaction would have been $37 million;

(b) the sale of the land represented $6.2 million;

(c) approximately $31 million would be realized by the sale of the bondable lease.

After paying off the debt, a net of approximately $20 million would be available for distribution to the partnership. With respect to the GE Capital financing, Goldman Sachs and GMH would pay off any debt at 100 percent of the agreed upon allocated value. (Robinson N.T. (6/18/98), pp. 165, 175.)

(141) Closing costs were to be capitalized. (Robinson N.T. (6/18/98), p. 185.)

(142) GMH planned to accelerate its cash distributions from the Bala transaction by selling buildings at the earliest possible stage, increasing rents, and deferring expenses and capital expenditures. (Robinson N.T. (6/18/98), pp. 155-56, 159-60.)

(143) Pursuant to the agreement between GMH and Goldman, the partners would have received cash distributions from the partnership along lines consistent with prior agreements between GMH and Whitehall relating to other deals as follows: all distributions were to be made in a 90/10 (Goldman/GMH) split until the partners received a return of all their invested capital. Thereafter, distributions continued to be governed by the 90/10 split until each partner received a 20 percent return on its investment. Finally, after the two foregoing conditions were met, GMH would receive a promoted distribution to a level of 28 percent, thereafter, with Goldman receiving the balance at 72 percent. Because of this arrangement, GMH had great incentive to accelerate cash flow. (Robinson N.T. (6/18/98), pp. 159-60.)

(144) In terms of dollars per square foot, the total value of the Bala Three East transaction came to $202 per square foot ($185 a square foot for the base building plus $17 a square foot per tenant improvements). (Robinson N.T. (6/18/98), p. 165.)

(145) Because of favorable market conditions in June 1998, GMH could have sold the property to either AHERF or another party at a comparable rate; AHERF's option was for $185 per square foot on Bala Three West. In fact, taking advantage of the favorable market, GMH sold nearly half of its portfolio in January 1998 for $350,000,000. (Robinson N.T. (6/18/98), p. 164; see Golboro N.T. (6/23/98), pp. 52-55.)

(146) As part of its agreement with Goldman Sachs, GMH was entitled to receive various fees from the Bala transaction as follows: (1) a net property management fee equal to 3 percent of the gross collected revenues from the properties; (2) an 8 percent construction management fee; and (3) leasing commissions,

which would have created additional income to GMH. (Robinson N.T. (6/18/98), pp. 167, 188-90.)

(147) Mr. Robinson testified that he and others at GMH worked with Mr. Geisser in developing assumptions relating to the cash flows from the property that were then used by Mr. Geisser in his damages analysis. With this method, GMH took the original assumptions the company used in initially valuing the property before negotiations and updating those assumptions to reflect current market conditions, which are more favorable than those that existed in early 1996. The court finds that the methods used are credible and sound. (Robinson N.T. (6/18/98), pp. 192-93; exhibit P-219; exhibit P-220.)

(148) Currently, the Bala properties are outperforming what GMH had projected; rents are higher, vacancy rates are lower, and bad debt experience is lower. In addition, the residual values of the properties substantially exceed the values projected by GMH at the time of negotiations with Prudential. (Robinson N.T. (6/18/98), p. 161.)

(149) The typical lease period for the Bala Plaza properties is five years. The current rental rate for One Bala Plaza starts at $24 a square foot and escalates by $1 a square foot each year throughout the lease term. At Two Bala Plaza, rents start at $27 a square foot, escalating by $1 a square foot per year for the lease term. Three Bala East and West both start at $28 a square foot and escalate by $1 a square foot each year during the lease term. (Giuliani N.T. (6/16/98), pp. 246-47.)

(150) The court finds that the vacancy rates are low for the Bala properties and have steadily decreased since the early 1990s. One Bala Plaza is currently 99 percent leased, Two Bala is 98 percent leased, and Three Bala

is also 98 percent leased. In fact, Ms. Giuliani testified that the current market at Bala Plaza is the best she has seen. (Giuliani N.T. (6/16/98), pp. 248-49.)

(151) The court finds that current losses due to bad risk tenants are minimal because the Bala property is only taking credit-worthy tenants. If there is a new company or start-up company, the Bala properties secure a line of credit. (Giuliani N.T. (6/16/98), p. 249.)

(152) The court finds that GMH planned to spread the capital improvements over the projection period. This was consistent with GMH's plan to defer improvements to accelerate cash flows. (Robinson N.T. (6/*/98), p. *.)

### Wayne Geisser—Lost Profits to GMH

(153) Mr. Geisser is a certified public accountant, having received his CPA certificate in 1977. (Geisser N.T. (6/19/98), p. 81; exhibit P-221.)

(154) The court finds that Mr. Geisser is a qualified expert accountant in the areas of lost profits and the analysis of business losses. (Geisser N.T. (6/19/98), pp. 86, 88; court statement (6/19/98), p. 88.)

(155) In preparing his calculations, Mr. Geisser, along with the assistance of GMH personnel, prepared detailed cash flow projections pertaining to each of the properties. Mr. Geisser started with the basic projection that GMH had compiled at the time of due diligence on the Bala transaction (based on the financial data provided to GMH by Prudential), including a measure for evaluating performance. (Geisser N.T. (6/19/98), p. 119; exhibit P-219; exhibit P-220.)

(156) In arriving at his projections, to confirm their accuracy, Mr. Geisser reviewed data from the ProJect database and software package designed specifically

for real estate projections, and was specifically used in this transaction; consulted with GMH; and reviewed the manuals pertaining to the ProJect database. (Geisser N.T. (6/19/98), p. 123.)

(157) Mr. Geisser's projections reflect net operating income. Net operating income is significant because it is the primary way that property is evaluated in terms of its income productivity, and it is used directly in connection with establishing the value of a property when a capitalization rate is applied. Net operating income is the primary measure for evaluating how a property is doing. (Geisser N.T. (6/19/98), pp. 123-24.)

(158) Cash flow differs from net operating income in the following manner: to calculate cash flow from net operating income, one must typically deduct tenant improvements and brokers' commissions (*i.e.,* cash flow equals net operating income minus tenant improvements and brokers' commissions ("TIBCs"). Cash flow was used in Mr. Geisser's analysis to determine how much is available to be paid to the partners in the partnership. (Geisser N.T. (6/19/98), p. 125.)

(159) In preparing his expert opinion, Mr. Geisser made a series of assumptions and prepared a series of calculations pertaining to various facets of the Bala Plaza transaction based upon admitted exhibits and testimony. The facets of the transaction he focused upon were: GMH's plans for the acquisition, operation and disposition of the properties. (Geisser N.T. (6/19/98), p. 91.)

(160) The court finds that the most appropriate method and the method most within Mr. Geisser's area of expertise is the cap rate analysis. Based on a cap rate analysis, Mr. Geisser concluded that the total lost profits to GMH in this matter was $20,340,623. This $20,340,623 figure represents lost profits to GMH at the time of trial based

on a calculation of lost profits through the year 2003, then discounted back to June 30, 1998 and compounded forward from January 1, 1997 (the approximate date of closing) to June 30, 1998 (the time of trial). (Geisser N.T. (6/19/98), pp. 94, 99-100, 164.)[7]

(161) The capitalization rate is a methodology that is used to calculate the market value of a property based on the income stream it is producing. The lower the cap rate, the higher the market value. (Geisser N.T. (6/19/98), pp. 94-95.)

(162) Mr. Geisser performed his analysis of lost profits over the period of 1997 through 2003. Mr. Geisser's analysis took into account actual changes and trends in the marketplace that occurred from January 1, 1997 up to the time of trial. (Geisser N.T. (6/19/98), pp. 95-97.)

(163) To make his calculations and further his analysis, Mr. Geisser set up a model which accounted for the cash flows from the acquisition, operation and disposition of the five properties that made up the Bala Plaza property. The model accounted for the cash flows that would have existed over approximately a six-year period of time, from the beginning of 1997 through 2003. (Geisser N.T. (6/19/98), pp. 95, 97.)

(164) In preparing his model, Mr. Geisser made the following assumptions, which the court finds credible and valid:

(a) the overall transaction involved GMH acquiring the Bala Plaza properties in late 1996;

(b) the Bala Plaza properties would be acquired at a price of $107,250,000;

---

7. Alternatively, using a market comparison analysis, Mr. Geisser concluded that the total lost profits for GMH in this matter was $23,337,801. (N.T. 6/19/98, p. 164.)

(c) a transaction between GMH and Allegheny Health Systems regarding Bala Three East was to occur simultaneously with the GMH/Prudential transaction;

(d) for the purposes of simplicity in the projection, closing was assumed to be January 1, 1997;

(e) an option was to be granted to AHERF for Bala Three West, and either AHERF or another party would have purchased Bala Three West at a comparable price in 1998;

(f) Bala One and Two were to be held/operated investment properties by GMH/Goldman Sachs for a period of time and then were to be disposed of in the year 2003.

"—Bala One was calculated to be sold for $173 a square foot (for a total of $63,023,459), and

"—Bala Two was calculated to be sold for $136 a square foot (for a total of $48,951,553)."

(g) for the sale of Bala One and Two, it was also assumed that 2 percent of the amount realized would be closing costs;

(h) the value of Bala One and Two was to be calculated after six years;[8]

(i) GMH was to make certain payments to Prudential as a result of the transaction;

(j) GMH would have incurred various costs associated with the transaction, which would have been capitalized along with the cost of the properties;

(k) GMH would have various streams of income as a result of its transactions with Prudential and AHERF,

---

8. A six-year time period was used to value the property because it was a middle time frame between how GMH usually evaluates these types of assets. (N.T. 6/19/98, p. 99.)

operation of the property, and disposition of the properties;

(l) losses were projected over six years, from 1997 to 2003;

(m) closing costs in connection with the Prudential and AHERF transaction would be $3,039,043, which included items such as transfer taxes, financing, legal, and other miscellaneous fees associated with closing. Mr. Geisser added an additional $100,000 to the closing costs for the sale of Bala Three East to account for any miscellaneous closing costs;

(n) the total cost of the GMH, Whitehall, Goldman Sachs acquisition was $113,436,225[9] (Exhibit P-224);

(o) GECC would receive 1 percent (conservatively high amount) of the total amount financed;

(p) payments made to outside brokers for the Bala properties would be minimal, but would have been made at approximately 20 percent of the total commission income;

9. This number is composed of the purchase price, the closing costs, the acquisition fees, and the tenant improvements. Mr. Geisser then allocated these costs over the five buildings; namely Bala Three East, Bala Three West, Bala One and Bala Two (the Saks Fifth Avenue is included within the Bala Two). The allocation process was based on exhibit P-128, the document from GMH to Goldman Sachs, which set forth an analysis of the appropriate allocation. Since this document, exhibit P-128, used a total purchase price of approximately $108 million, Mr. Geisser took the relative proportion between the $108 million and the $107,250,000 and used this same proportion to allocate among the five buildings. The allocation, in terms of Bala Two, is relatively low in terms of a square footage basis because the Saks store, which makes up a large portion of Bala Two, has a very long-term lease at a low rate, and as a result, it has less inherent value. (N.T. 6/19/98, pp. 105-107.)

(q) there would be an annual $50,000 collection loss for the entire projection period;

(r) there would be a cost of approximately $5.6 million in non-tenant-related capital improvements, with adjustments, these improvements being spread over the entire projection period. This figure is based on the Eckland study, a study performed by an outside engineering firm hired by Goldman Sachs;

(s) an assumed market rate of 8-1/4 percent is used for the carrying costs for the debt;

(t) the retention rate for the Bala properties was 75 percent (historically as based on the Bala Plaza offering circular);

(u) Ms. Giuliani would continue to be the rental agent for Bala One, Bala Two and Bala Three West, and her compensation would have been in the range of approximately $130,000 for each year during the period of time that she operated the property;

(v) GECC would receive 100 percent of the allocated debt;

(w) a "going in" cap rate of 8.5 percent was used for calculating the value of Bala One and Bala Two. The 8.5 percent cap rate was, in part, drawn from information contained in the RERC report (exhibit P-227) which provided data relating to current cap rates in the marketplace;

(x) $2 million was withheld from the amounts realized in the AHERF transaction in the first period (*i.e.,* was not distributed to the partners) in order to provide operating cash for the properties; $1 million was held back in the remaining periods, and then in the final period, the $1 million was brought back into the partnership. (Geisser N.T. (6/19/98), pp. 98-99, 102, 104, 117, 118, 126-28, 133-35, 142-44, 154-55.)

(165) Mr. Geisser used the following assumptions for the AHERF transaction which the court finds credible and valid:

(a) there was to be a cash payment from AHERF of $6.2 million for the land option (exhibit P-102; exhibit P-110);

(b) there was a bonded lease which was to last for a period of 20 years, or 240 periods;

(c) the rental rate for Bala Three was $17.25 per square foot, or $268,683 on a monthly basis. (Exhibit P-102, P-110, P-72.) If that number was calculated over 240 periods, it has a present value of $31,533,148;

(d) the bonded lease interest rate was 8-1/4 percent (using Mr. Robinson's contemporaneous notes from his meeting with AHERF on September 11, 1996) (exhibit P-39);

(e) the GMH/Goldman Sachs partnership needed to make tenant improvements in the amount of $15 a square foot pursuant to their agreement with AHERF;

(f) at closing, $1 million was to be paid to Dr. Federman in connection with bringing the deal to fruition (to be paid in the form of cash or in the form of buildouts or other enhancements to the property);

(g) at closing, a $500,000 fee was to be paid to GMH;

(h) at closing, a $35,000 fee was to be paid to Mr. Melvin;

(i) the tenant improvements and brokerage commission in an amount of $1,612,182 were included as part of the acquisition cost;

(j) 2 percent of the total amount realized on the sale of Bala Three to AHERF would be closing costs;

(k) $10 additional per square foot was allocated for fit-out (in keeping with Allegheny's request of Sep-

tember 11, 1996). (Geisser N.T. (6/19/98), pp. 103-104, 109-110, 128, 143, 146; Holloway N.T. (6/15/98), p. 115.)

(166) The total amount realized by the GMH/Goldman partnership on the AHERF transaction would have been $37,733,148. (Geisser N.T. (6/19/98), p. 110.)

(167) The cash realized to the Goldman Sachs/GMH partnership from the AHERF transaction was $20,122,771. (Geisser N.T. (6/19/98), p. 111; exhibit P-224.)

(168) With respect to the financing of the Bala Plaza transaction, Mr. Geisser made the following assumptions, which the court finds credible and valid:

(a) 75 percent of the financing would have been provided by GE Capital (a total amount of $85,077,169);

(b) the balance ($28 million) was being provided by the equity contribution of GMH and Goldman Sachs;

(c) the balance ($28 million) was then broken down 90/10, with the Goldman Sachs portion of 90 percent being $25,523,151; and the GMH offer of 10 percent being $2,835,906 at 114 for a total required equity contribution of $28,359,056. (Geisser N.T. (6/19/98), p. 114.)

(169) Bala Three West would be sold as a result of favorable market conditions, to a party at a price comparable to that of the option held by AHERF; *i.e.*, for $185 per square foot. (Geisser N.T. (6/19/98), p. 127; exhibit P-102.)

(170) The total debt relating to the Bala properties was $85,077,169, allocated pursuant to the parameters contained in exhibit P-128, as follows: $17,510,377 to Bala Three East; $21,195,129 to Bala Three West; and the balance of $46,371,663 to Bala One and Two. (Geisser N.T. (6/19/98), p. 115.)

(171) If the Bala properties were not sold in 2003, but instead all three of the properties were sold in June 1998 to take advantage of the favorable market conditions, GMH would have received a proportionally larger distribution of the cash that would have been made upon the sale as calculated by Mr. Geisser. (Geisser N.T. (6/19/98), p. 131.)

(172) In determining which cap rate to apply when calculating the selling price of the buildings, Mr. Geisser considered the downward trend in cap rates from the time Prudential priced the properties in its offering memorandum to the present, and used information available from statistical sources, including the RERC report (exhibit P-227), and market data supplied by GMH personnel relating to market conditions. The 8.5 percent cap rate used by Mr. Geisser reflects current market conditions and trends. (Geisser N.T. (6/19/98), pp. 132-33.)

(173) Mr. Geisser also reduced the amount of damages by factoring in an alternative use of the $500,000 that would have been GMH's capital contribution (having contributed approximately $2.8 million but receiving back $2.3 million at time of closing). He applied an 8 percent rate of return on these monies. (Geisser N.T. (6/19/98), pp. 157-58.)

(174) Mr. Geisser used a discount rate of 5.6 percent because it is the current rate on six-year treasury notes, and Mr. Geisser deemed it to be a riskless rate of return. Higher discount rates include a risk factor of holding and operating the property. In this instance, using a higher discount rate with a risk factor would be inappropriate because the result of the negotiations are known; *i.e.,* the transaction did not occur, and the property was not sold to GMH. (Geisser N.T. (6/19/98), pp. 159-60.)

(175) Based on the foregoing, Mr. Geisser testified as to his opinion regarding GMH's lost profits.

(176) The court finds that GMH suffered lost profits in the amount of $20,340,623.

(177) The court is not persuaded by the damage analysis of defendants' expert Bruce Golboro for reasons that include the following:

"—Mr. Golboro ignored or, at the very least, did not take into account favorable trends that have occurred in the market since the date of breach to the date of trial. As a result, the cap rate used (10 percent) by Mr. Golboro was inappropriate.[10] Additionally, other assumptions he made, such as vacancy rates and rental rates, were flawed for the same reason. As a result of not taking into account actual trends from the date of breach to the time of trial, as well as for other reasons outlined below, Mr. Golboro reached an artificially low damage estimate." (Golboro N.T. (6/25/98), p. 77.)

"—Mr. Golboro used the high discount rate of 12 percent and attempted to justify its use because it is a rate he believed would be appropriate when evaluating a real estate venture. However, the use of this 12 percent rate is inappropriate in this instance because the question to be answered is how can we make plaintiffs whole or restore them to the position they would have been in had the Bala deal been consummated? It is not a question of analyzing the risks of a real estate investment." (Golboro N.T. (6/25/98), pp. 97, 99, 101-102.)

---

10. Moreover, the court notes that Mr. Golboro used a lower cap rate (9.2 percent) which would have led to a higher damage valuation, while acting as a consultant in a real estate transaction that occurred in the last quarter of 1997. (N.T. 6/25/98 (Golboro), pp. 84-85.)

"—Mr. Golboro did not use a proper method to discount to present value, because he did not compound forward to the date of trial." (Golboro N.T. (6/25/98), pp. 97, 99.)

"—Mr. Golboro ignored testimony or evidence in his analysis which the court has found to be credible, including the following:

"—that the GMH/Goldman Sachs partnership would pay down 100 percent of the allocated debt (and *not* 120 percent).

"—that the GMH/Goldman Sachs partnership would succeed in accelerating cash flows from the transaction, leading to the partnership parties' earlier recovery of a 20 percent return on their investment and the earlier return of their investment, thereby allowing GMH to receive the 28 percent promote rate at the earliest possible time.

"—the recent trends in the Philadelphia suburban market are quite favorable, allowing for high rates of return on real estate investments, both from disposition and through operation.

"—Mr. Golboro ignored that GMH would have received back at the time of closing with Prudential all but $500,000 of its capital investment." (Golboro N.T. (6/25/98), p. 102.)

(178) The court finds that the testimony of Wayne Geisser, GMH's damages expert, was credible, well-supported, and persuasive with respect to the lost profits due to GMH as a result of Prudential's actions. The court bases this finding of fact that Mr. Geisser has expertise in evaluating lost profits in a litigation setting. Further, Mr. Geisser's projections were conservative and were supported both by the record of events between

the parties as well as an analysis of current trends in the real estate marketplace.

(179) The court finds that on or about September 3, 1996, GMH asked Prudential for a number at which Prudential would sell GMH the Bala property.

(180) The court finds that on September 9, 1996, Mr. Glenn and Mr. Joseph told GMH Prudential would sell it the property for a cash price of $107,250,000 and assured GMH that the number was not a "moving target."

(181) The court finds that Mr. Joseph, pursuant to Mr. Glenn's instructions, told GMH that its response to Prudential's price proposal had to be in writing.

(182) The court finds that on September 11, 1996, GMH agreed to pay Prudential's price of $107,250,000 and that, as Prudential required, GMH put its acceptance in writing. The court finds that Mr. Joseph told Mr. Robinson to put GMH's letter in the form of a letter of intent and that Mr. Joseph approved the form of the September 11 letter before GMH sent it to Prudential.

(183) The court finds that as of September 11, 1996, the parties had reached agreement on all of the essential terms of the transaction and that they had manifested an intention to be bound by their agreement.

(184) The court finds Mr. Glenn had authority, or apparent authority, to act for Prudential in its negotiations with GMH, and that Mr. Glenn's statements, representations and assurances made to GMH in connection with the sale of the Bala property were within the scope of his authority as vice president of Prudential Realty and as team leader for disposition of the Bala property.

(185) The court finds that it was reasonable for GMH to believe that Mr. Glenn had authority to act on Pru-

dential's behalf in connection with the Bala property. In particular, it was reasonable for GMH to believe that when Mr. Glenn communicated Prudential's "will sell" price on September 9, he had the authority to do so. The court bases this finding, in part, on the following facts:

"—Mr. Glenn was a vice president of Prudential Realty and was 'placed in charge of the disposition of the Bala properties.'" (Exhibit P-234; Glenn dep. (2/24/97), pp. 6-7, 19; Fascitelli N.T. (6/19/98), p. 30.)

"—He handled the negotiations on Prudential's behalf and made decisions on issues which arose during the negotiations." (Holloway N.T. (6/15/98), pp. 56-57, 61-62, 85-86; Robinson N.T. (6/18/98), pp. 90-91.)

"—Prudential extended the LOI after it expired on July 3, 1996, based on Mr. Glenn's oral commitment. Mr. Glenn was authorized to sign letters of intent and even final purchase and sale agreements after obtaining the necessary approvals." (Exhibit P-234; Glenn dep. (2/24/97), pp. 76-78, 132-33; exhibit P-235; Triece dep. (3/18/97), pp. 69-70.)

"—Mr. Holloway testified Mr. Glenn told him he had to obtain approval of any transaction from Prudential's investment committee and then the finance committee of the board of directors, but assured him approval was routine, a 'rubber stamp.'" (Holloway N.T. (6/15/98), pp. 61-62; Holloway N.T. (6/16/98), pp. 99-100; Robinson N.T. (6/18/98), p. 80; see also, exhibit P-234; Glenn dep. (2/24/97), pp. 81-82.)

"—Mr. Glenn testified that on August 12, 1996, he met with the investment committee and the decision was made to reject GMH's offer. He then called Mr. Holloway to advise him of Prudential's decision." (Exhibit P-234; Glenn dep. (2/24/97), pp. 204-205; Hol-

loway N.T. (6/15/98), p. 116; see also, exhibit P-235; Triece dep. (3/18/97), pp. 23-24.)

"—Mr. Holloway asked for Prudential's 'will sell' price on or about September 3, 1996. Mr. Glenn responded with a price on September 9, 1996.

"—GMH knew Mr. Glenn had been discussing its proposals with his superiors, including Prudential's investment committee. Mr. Glenn and Mr. Joseph told GMH the delay in getting Prudential's 'number' was caused by Mr. Twardock and Mr. Triece not being available and that they would get back to GMH after they talked to those gentlemen. Prudential's investment committee had already approved the terms set forth in the LOI, including the total price." (Holloway N.T. (6/15/98), p. 116; Holloway N.T. (6/16/98), pp. 19-21, 51; see exhibit P-237; Joseph dep. (3/4/97), pp. 423-24; see exhibit P-234; Glenn dep. (2/24/97), pp. 74-75; Triece N.T. (6/23/98), p. 54.)

"—GMH believed Mr. Glenn had obtained the approvals he needed when he came back with Prudential's price. Mr. Holloway testified that Mr. Glenn said he was getting approval from Mr. Triece and Mr. Twardock for the price Mr. Glenn ultimately proposed on September 9. 'So when he came with the number, there's no reason for us to ever believe, for one reason or another, that that wasn't the number that was approved by you guys [Prudential]. That number was put on the table by Prudential, not by us.' " (Holloway N.T. (6/16/98), p. 51; see also, Robinson N.T. (6/18/98), pp. 240-41.)

"—Prudential has not claimed Mr. Glenn was not authorized to make any of the representations he made; it simply takes a different view of what those representations meant."

(186) Based on the foregoing, the court finds that, at the very least, Mr. Glenn had apparent authority to commit Prudential to a "will sell" price on September 9.

(187) The court concludes that Mr. Glenn and Mr. Joseph repeatedly misrepresented to GMH that Prudential and CB Commercial were not negotiating with other parties regarding the Bala property and that the deal was GMH's deal, while Prudential was, in fact, negotiating with and laying the groundwork to sell the property to GSIC. These misrepresentations were made at the very least from August 15, 1996, when Prudential, without telling GMH, promised GSIC an "exclusive look" at the property, until September 12, 1996, when Prudential announced that it intended to sell the property to GSIC.

(188) While the evidence establishes that on September 10, 1996, GMH was told that GSIC was interested in and had been taken through the property, the court finds that GMH was not told GSIC had made offers, that GSIC had been given an "exclusive look," or that Prudential was working toward a sale of the property to GSIC. (Holloway N.T. (6/16/98), pp. 182-83; Robinson N.T. (6/18/98), p. 124.)

(189) The court finds that Mr. Glenn and Mr. Joseph knew they were dealing with GSIC at the time they were assuring GMH they were not dealing with others, and that they intended to deceive GMH. This finding is reinforced by those witnesses' evasive testimony regarding their negotiations with GSIC and GMH, and by the false statements Mr. Glenn made to both GMH and to GSIC regarding the other party's involvement.

(190) The court finds that GMH relied on the representations of Mr. Glenn and Mr. Joseph and that

GMH's reliance was justifiable. In particular, this court finds that:

"—GMH relied on Prudential's original promises of exclusivity when GMH spent time and money on due diligence and worked to secure AHERF as a tenant. GMH would not have proceeded with the transaction had it not received Prudential's commitment that it would not negotiate with others." (Holloway N.T (6/15/98), pp. 63-67.)

"—As the negotiations proceeded, GMH believed, based on Prudential's representations, that it had time to consider its position and to attempt to work out details which would not have been important if it had known the entire deal might be at risk." (Holloway N.T. (6/16/98), pp. 6-7; Holloway N.T. (6/15/98), pp. 102-103.)

"—On August 12, 1996, Mr. Glenn specifically agreed to give GMH time to put together an all-cash proposal." (Holloway N.T. (6/15/98), pp. 115-17.)

"—The existence of a competing bidder made a difference to GMH, and if GMH had been told of the negotiations with GSIC, it would have handled the situation differently. The court finds reasonable and credible the testimony of Mr. Holloway that GMH would have insisted on Prudential's final position regarding price structure and would have closed the deal." (Holloway N.T. (6/15/98), p. 56; Holloway N.T. (6/16/98), p. 221.)

(191) The court finds that GMH was damaged as a result of defendants' misrepresentations.

"—As soon as GMH was told of GSIC's interest in the property, it accepted Prudential's terms." (Holloway N.T. (6/16/98), p. 183; Robinson N.T. (6/18/98), p. 127.)

"—By that time, however, Prudential had reached a point with GSIC from which it believed it could not, or did not want, to retreat." (Exhibit P-235; Triece dep. (3/18/97), pp. 186-87, 194-95.)

"—If GMH had been told on August 12 that Prudential was going to approach another prospective buyer (and, in fact, offer that entity an 'exclusive look' at the property), GMH could have made the decision on that date to accept Prudential's terms, before Prudential even entered into serious negotiations with GSIC." (Holloway N.T. (6/15/98), p. 56; Holloway N.T. (6/16/98), p. 221.)

"—Mr. Holloway's net worth exceeded $53 million in 1996, and he had the ability to raise additional money to close the deal." (Holloway N.T. (6/16/98), pp. 132-33.)

"—After Prudential announced its decision to sell the property to GSIC, GMH did raise its price substantially, because all of the other pieces of the deal were in place and '[w]e knew how important this deal was to GMH and where the future of our company was going.' " (Holloway. N.T. (6/16/98), pp. 61-63, 65-66.)

(192) The court finds that GMH and Prudential would have consummated their transaction had not the negotiations with GSIC intervened.

"—Though Mr. Glenn testified that he believed negotiations with GMH were terminated August 12, Prudential continued to accept and respond to proposals from GMH." (Exhibit P-234; Glenn dep. (2/24/97), pp. 95-98, 186-88; exhibit P-235; Triece dep. (3/18/97), pp. 147, 151; exhibit P-29 (8/27/96).)

"—Asked why, Mr. Glenn responded:

"Call it emotion. I had been working with these guys and I—that's—it was emotion. We had spent a lot of

time. They had done their due diligence. They had moved down the road. They had gone toward the end so I was still willing to listen to them." (Exhibit P-234; Glenn dep. (2/24/97), p. 277.)

"—Even after its agreement with GSIC, Prudential agreed to try to 'unwind' the transaction and sell the property to GMH, though it believed GSIC would expect a fee. Prudential believed it would benefit from selling the property to GMH if it could get the same price it was getting from GSIC, because GMH had completed its due diligence, and the transaction could have closed sooner. According to Mr. Glenn, GMH . . . "had clearly done all of their due diligence. They are definitely a step ahead of GSIC, and they expressed their interest. If GSIC would have accepted the breakup fee, they were already done with their due diligence, and things would—Prudential would still end up with the same— Prudential was not trying to profit from it. We would have ended up with the same price." (Exhibit P-235; Triece dep. (3/18/97), pp. 167-70, 181; exhibit P-234; Glenn dep. (2/24/97), p. 310.)

"—GSIC, however, did not agree to unwind the transaction, and the property was ultimately sold to GSIC.

"—The benefits to Prudential of selling to GMH rather than to GSIC were equally present before September 12, 1996; and the difference was that, before September 12, there would not have been the same question regarding a commitment to GSIC."

(193) The court finds that defendants used the bids from GSIC and GMH to negotiate a higher price for the property. For example, on September 9, 1996, when Mr. Glenn gave GMH Prudential's cash price number of $107,250,000, Mr. Glenn knew an offer of that amount would be a higher net offer than Prudential's pending offer from GSIC (though he did not tell GMH

that). (Exhibit P-234; Glenn dep. (2/24/97), pp. 258-59.) After GMH agreed to Mr. Glenn's price, Prudential told GSIC on September 12, 1996 that GMH had made an "unsolicited offer" that was a higher net number than GSIC's, and that if GSIC agreed to pay certain fees totalling more than $800,000, Prudential would sign GSIC's LOI. (Grubb N.T. (6/18/98), pp. 42, 67.) GSIC did agree to pay the additional fees, and Prudential signed its LOI. (Exhibit P-234; Glenn dep. (2/24/97), pp. 280, 286-87.)

(194) The court finds that when defendants told GMH it had to put its acceptance of Prudential's price term in writing, defendants intended to and did use GMH's acceptance letter to induce GSIC to raise the price it was willing to pay for the property. The court also finds that defendants knew GMH would be damaged as a result of their representations and Prudential's sale of the property to GSIC.

(195) The court finds that the parties agreed the Bala property would be kept "off the market" as long as GMH was "seriously pursuing the acquisition of the property and [was] meeting the deadlines that they had proposed to [Prudential]." (Triece N.T. (6/17/98), p. 199; Holloway N.T. (6/15/98), pp. 63-67.)

(196) The court finds Mr. Holloway and Mr. Robinson credible when they testified that Prudential representatives repeatedly assured them quite specifically that the deal was "GMH's deal" and that they were not negotiating and would not negotiate with anyone else. (See *e.g.*, Holloway N.T. (6/15/98), pp. 89, 99-100, 109; Holloway N.T. (6/16/98), p. 12; Robinson N.T. (6/18/98), p. 82.)

(197) The court finds that Prudential knew GMH would not proceed to spend money on due diligence and attempt to secure AHERF as a tenant, thereby giving

Prudential the possibility of a premium above what the market was willing to pay, without Prudential's commitment that it could do so without competing negotiations, and that GMH did move forward with the transaction in reliance on Prudential's assurances.

(198) The court finds that GMH manifested its intention to be bound to an agreement to negotiate in good faith by performing due diligence, at substantial expense, by negotiating with AHERF regarding a lease for the property, and by engaging in intensive negotiations with Prudential to finalize the agreement.

(199) The court finds that Prudential manifested its intention to be bound to an agreement to negotiate in good faith by taking steps toward the finalization of the agreement, by assuring GMH the property was "off the market" during the negotiations and by extending the period of the LOI while negotiations were continuing.

(200) The court finds that Prudential's course of conduct justified GMH in believing that GMH, CB Commercial and Prudential were dealing exclusively with one another throughout their negotiations and were working toward a closing on the property.

(201) The court finds that the LOI clearly allowed either GMH or Prudential to terminate negotiations. The LOI is not clear, however, as to how negotiations would be terminated or whether notice was required before termination of negotiations.

(202) The court finds that the parties expected that notice would be provided if negotiations were terminated and that this expectation was reasonable. The court relies on the fact that the LOI did not say notice was *not* required; on the testimony of the witnesses, including Prudential's witness, Mr. Triece; and on the evidence that GMH repeatedly asked defendants if they

were dealing with others and was repeatedly told they were not.

(203) The court finds that Mr. Holloway and Mr. Robinson did not insist that the agreement to keep the property off the market be included in the May 13, 1996 LOI because Prudential insisted that GMH sign its form of the LOI in order to move forward, and because GMH relied on the verbal assurances Mr. Glenn made. (Holloway N.T. (6/15/98), p. 95; Robinson N.T. (6/18/98), pp. 82, 84, 210-11.) The court further finds that GMH acted reasonably and that Prudential's assurances that the property would be kept off the market were the underlying premise of the parties' negotiations.

(204) The court finds that Prudential never did terminate negotiations with GMH until it closed the sale with GSIC in December 1996. Even after entering into a letter of intent with GSIC, Prudential continued to negotiate with GMH regarding the possibility of unwinding its agreement with GSIC and selling the property to GMH instead. (Holloway N.T. (6/15/98), p. 117; Robinson N.T. (6/18/98), pp. 105-106.)

(205) Prudential representatives acknowledged that Prudential continued to consider and respond to proposals from GMH throughout the month of August 1996 and into September. (Exhibit P-234; Glenn dep. (2/24/98), pp. 96-98, 185-90, 221-22.)

(206) The court's finding that Prudential did not terminate negotiations with GMH is supported by the fact that until September 12, 1996, Prudential's leasing agent continued to submit leases for the property to GMH for GMH's approval.

(207) The court finds that when Prudential promised GMH on September 9, 1996 that it would sell the property to GMH if GMH would agree in writing to pay

$107,250,000 in cash, Prudential should reasonably have expected GMH to rely on its promise.

(208) The court finds that Prudential's promise induced GMH to accept Prudential's terms in writing and to finalize its lease agreement with AHERF.

(209) The court finds that on September 11, 1996, GMH and AHERF had reached agreement on all essential terms of their agreement.

## CONCLUSIONS OF LAW

### *Liability*

### Count I—Liability—GMH v. Defendant Prudential Realty: Breach of Contract

(1) GMH's claim for breach of contract is based on its position that it and Prudential entered into an enforceable oral contract of sale for the Bala property on September 11, 1996, and that Prudential breached this contract by selling the property to GSIC.

(2) "It is established law in this Commonwealth that parties may bind themselves contractually prior to the execution of a written document through mutual manifestations of assent, even where a later formal document is contemplated." *Krause v. Great Lakes Holdings Inc.,* 387 Pa. Super. 56, 63-64, 563 A.2d 1182, 1185 (1989).

(3) "Where the parties have settled upon the essential terms of the contract, and the only remaining act to be done is the formalization of the agreement, the latter is not inconsistent with the existence of a present contract." *Krause v. Great Lakes Holdings Inc., supra* at 64, 563 A.2d at 1185.

(4) "If the parties agree on essential terms and intend them to be binding, a contract is formed even though the parties intend to adopt a formal document with

additional terms at a later date." *Krause v. Great Lakes Holdings Inc., supra* at 64, 563 A.2d at 1186; accord *Field v. Golden Triangle Broadcasting Inc.,* 451 Pa. 410, 418, 305 A.2d 689, 693-94 (1973); *Hatalowich v. Redevelopment Authority of Monessen,* 454 Pa. 481, 486, 312 A.2d 22, 24 (1973).

(5) As the *Krause* court recognized, a written contract may be required if that is what the parties intended. The court stated, however, that "[t]he intent of the parties is a question of fact to be determined by the fact[-]finder." *Krause,* 387 Pa. Super. at 64, 563 A.2d at 1186.

(6) As the Pennsylvania Supreme Court stated in *Goldman v. McShain,* 432 Pa. 61, 247 A.2d 455 (1968), "oral testimony is usually required to determine whether the parties did or did not intend the formal document to be the only binding agreement." *Goldman,* 432 Pa. at 69, 247 A.2d at 459 (citing Restatement (Second) of Contracts §26 and comment b). (footnote omitted)

(7) The court concludes that the oral testimony of the parties' witnesses concerning whether the parties entered into a binding contract on September 11, 1996 or were still engaged in negotiations is admissible.

(8) The court concludes that the provisions of the May 13, 1996 LOI, including but not limited to paragraphs 8 and 9, do not preclude GMH from arguing that an oral contract was formed on September 11, 1996.

(9) The court concludes that the disclaimer agreement, entered into on or about February 2, 1996, was superseded by the letter of intent, entered into on May 13, 1996 by GMH and Prudential; the court concludes that said letter is governed by industry practice.

(10) An agreement prohibiting modifications except in writing may be modified by a later oral agreement

if the parties' conduct clearly shows intent to waive the requirement. If the fact-finder finds that was an oral agreement to modify the written agreement, it can find waiver of the "no oral modifications" provision. *Empire Properties Inc. v. Equireal Inc.,* 449 Pa. Super. 476, 488, 674 A.2d 297, 303; *Emerman v. Baldwin,* 186 Pa. Super. 561, 571, 142 A.2d 440, 444-45 (1958); *Schultz v. The Pet Food Giant Inc.,* 1998 U.S. Dist. Lexis 603 (E.D. Pa. Jan. 22, 1998).

(11) The court concludes that GMH and Prudential entered into an oral contract of sale for the Bala property on September 11, 1996, that Prudential waived any requirements set forth in the LOI regarding the final contract, and that Prudential breached the contract by selling the property to GSIC. Specifically, the court concludes that after the parties had negotiated for months, GMH on September 3, 1996, asked for Prudential's final position on how much of the agreed purchase price of $109,250,000 should be paid in cash; that Mr. Glenn responded on September 9 that Prudential's number for a cash price was $107,250,000; that GMH agreed to this price orally and then, as Prudential demanded, in writing; and that GMH's September 11, 1996 letter incorporated the May 13, 1996 LOI which contained other terms and conditions to which the parties had already agreed (and which Prudential's investment committee had already approved), including a description of the property, a provision for a down payment, and details regarding closing costs and brokers' commission.

(12) The court concludes that GMH has proven the existence of an oral contract by evidence that is clear and convincing.

(13) Evidence of the custom or practice of the industry is admissible on the issue of whether an enforceable

oral contract can be formed when the parties' written LOI contains requirements regarding the approval and execution of a contract of sale. See *e.g., Jeannette Paper Company v. Longview Fibre Company,* 378 Pa. Super. 148, 158, 548 A.2d 319, 324 (1988).

(14) The court concludes that Prudential is bound by the statements, representations and assurances made to GMH by Mr. Glenn in connection with the sale of the Bala property, including the statements which are the basis for GMH's breach of contract claim.

(15) Under Pennsylvania law, a principal is responsible for the acts of its agent, even if it did not know of those acts and even if it forbade such acts, so long as they were within the agent's scope of employment. *Aiello v. Ed Saxe Real Estate Inc.,* 508 Pa. 553, 562, 499 A.2d 282, 287 (1985); *Cohen v. Blank,* 359 Pa. Super. 93, 518 A.2d 582 (1986).

(16) The court concludes that Mr. Glenn's statements, representations and assurances made to GMH in connection with the sale of the Bala property were within the scope of his authority as vice president of Prudential Realty and as team leader for disposition of the Bala property.

(17) The court concludes that the fact that Prudential considered itself obligated to GSIC based on an LOI signed by Mr. Glenn and Mr. Glenn's oral assurances that Prudential would work with GSIC supports a conclusion that Mr. Glenn had actual authority to bind Prudential in connection with the sale of the Bala property.

(18) The court concludes that regardless of whether Mr. Glenn had actual authority, he had apparent authority, and it was reasonable for GMH to believe that

Mr. Glenn had authority to act on Prudential's behalf in connection with the Bala property. The court further concludes that it was reasonable for GMH to believe that when Mr. Glenn communicated Prudential's "will sell" price on September 9, he had the authority to do so.

(19) The court's conclusion that Mr. Glenn, as the "team leader" for Prudential, had actual or apparent authority to bind Prudential is further supported by the factual testimony of Mr. Fascitelli, based on his personal experience working as a broker on behalf of Prudential, concerning the role of the "team leader" at Prudential.

(20) "The test for determining whether an agent possesses apparent authority is whether 'a man of ordinary prudence, diligence and discretion would have a right to believe and would actually believe that the agent possessed the authority he purported to exercise.' " *Universal Computer Systems Inc. v. Medical Services Association,* 628 F.2d 820, 823 (3d Cir. 1980) (quoting *Apex Financial Corp. v. Decker,* 245 Pa. Super. 439, 443, 369 A.2d 483, 485-86 (1976)); see also, *Farris v. J.C. Penney Co.,* no. 95-7432, slip op. at 10-12 (E.D. Pa. April 15, 1998).

(21) The court concludes that in view of the parties' conduct throughout the transaction, GMH's belief that Mr. Glenn was giving it Prudential's final price on September 9, 1996 and had the authority to conclude a binding agreement was reasonable.

(22) The court concludes, based on the testimony and the report of Michael D. Fascitelli, that parties "routinely make oral agreements intending to be bound by them," even in large and complex transactions.

## Count II—GMH v. All Defendants: Fraudulent Misrepresentations

(23) Count II of the second amended complaint, for fraudulent misrepresentations, is based on GMH's position that defendants falsely and fraudulently assured GMH that Prudential was not negotiating with any other party for sale of the Bala property, when Prudential was in fact negotiating with and laying the groundwork to sell the property to GSIC.

(24) Under Pennsylvania law:

"Fraud consists of anything calculated to deceive, whether by single act or combination, or by suppression of truth, or suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture." *Delahanty v. First Pennsylvania Bank N.A.,* 318 Pa. Super. 90, 107, 464 A.2d 1243, 1251 (1983).

(25) The elements of a fraudulent misrepresentation claim under Pennsylvania law are: "(1) a misrepresentation; (2) a fraudulent utterance thereof; (3) an intention by the maker that the recipient will thereby be induced to act; (4) justifiable reliance by the recipient upon the misrepresentation; and (5) damage to the recipient as a proximate result." *Delahanty, supra* at 108, 464 A.2d at 1252.

(26) Plaintiff must satisfy these elements by evidence which is clear and convincing. *Delahanty, supra* at 109-111, 464 A.2d at 1252-54.

(27) "[F]raud can be established by the evidence of a single witness, and there is no necessity that it be proven by the testimony of two witnesses, or by that of one witness, with corroborating circumstances." *Delahanty, supra* at 111, 464 A.2d at 1253.

(28) The court concludes that GMH has satisfied its burden of proving fraud by clear and convincing evidence. *Delahanty, supra* at 111-12, 464 A.2d at 1253-54.

(29) The court concludes that clear and convincing evidence establishes that defendants made assurances to GMH until September 12, 1996 that Prudential was not dealing and would not deal with others, while in fact, at least by August 15, 1996, Prudential was soliciting and accepting offers from GSIC. This evidence satisfies the element of misrepresentation. See *Den-Tal-Ez Inc. v. Siemens Capital Corp.*, 389 Pa. Super. 219, 252-53, 566 A.2d 1214, 1230-31 (1989).

(30) Clear and convincing evidence also establishes that the misrepresentations were made with fraudulent intent. "It is well settled that fraud is proved when it is shown that the false representation was made knowingly, or in conscious [disregard] of the truth, or recklessly without caring whether it be true or false." *Delahanty, supra* at 108, 464 A.2d at 1252. The court concludes that there is no question that defendants knew they were dealing with GSIC at the time they were assuring GMH they were not dealing with others.

(31) The court concludes that the evidence establishes by clear and convincing evidence that GMH justifiably relied on defendants' assurances. The court concludes that, in particular, GMH relied on Prudential's original promises of exclusivity when GMH spent time and money on due diligence and worked to secure AHERF as a tenant, and as the negotiations proceeded, GMH believed, based on Prudential's representations, that it had time to consider its position and to attempt to work out details which would not have been important if it had known the entire deal be at risk. See *Delahanty, supra,* 318 Pa. Super. at 111-12, 464 A.2d at 1254;

*Silverman v. Bell Savings & Loan Association*, 367
Pa. Super. 464, 473-75, 533 A.2d 110, 114-15 (1987).

(32) The court concludes that the best evidence of
what GMH would have done had it been notified that
Prudential was pursuing negotiations with GSIC is what
GMH actually did when it learned on September 10
that GSIC was interested in the property: on the af-
ternoon of September 11, GMH faxed Prudential a letter
accepting its terms as to the negotiating details that
remained. The court has previously found Mr. Holloway
credible when he testified that after Prudential told him
it was committed to sell the property to GSIC, he told
Mr. Triece the loss of the property was a significant
loss to him and he was "willing to increase his price
significantly." (Exhibit P-235; Triece dep. (3/18/97),
pp. 166-68; Holloway N.T. (6/16/98), pp. 65-66.) The
court has further previously found Mr. Holloway cred-
ible when he testified that on November 13, 1996, the
day after GMH believed GSIC's due diligence period
expired, GMH handed Prudential a "signed agreement
of sale without any contingencies," stating a price of
$109,250,000 plus TBICs, together with a check for
a million dollars.

(33) The court concludes that Prudential's delays in
responding made GMH concerned that another bidder
might be involved and that GMH did the only thing
it reasonably could do: it repeatedly asked Prudential
for assurances that Prudential was not dealing with any-
one else. Prudential gave those assurances directly and
plainly. (See *e.g.,* Holloway N.T. (6/16/98), pp. 161-62.)

(34) The court concludes that the fact that the parties'
exclusivity agreement was not included in their written
LOI does not undermine GMH's claim for fraud or
its proof on the elements of justifiable reliance. The
court concludes that GMH would not have proceeded

with the transaction had Prudential not committed to keep the property "off the market," especially without protection for its due diligence expenses. The court also concludes that the parties expected that notice would be provided if negotiations were terminated and that this expectation was reasonable.

(35) The court concludes that clear and convincing evidence also establishes that GMH was damaged as a result of its reliance on defendants' misrepresentations, and that GMH and Prudential would have consummated their transaction had not the negotiations with GSIC intervened.

(36) The court concludes that GMH's damages include the amounts it spent in reliance on Prudential's false representations and the profits it lost due to its loss of the contract.

(37) The court further concludes that based on the above stated facts, reliance damages are not speculative. In *Universal Computer,* the Third Circuit rejected an argument that damages based on plaintiff's loss of a contract were speculative because there was no guarantee plaintiff would have been awarded the contract. 628 F.2d at 826. The court found the jury reasonably concluded that if defendant's employee had picked up plaintiff's bid as he had promised, plaintiff would have been awarded the contract, since plaintiff's bid would have been the low bid, and there was no evidence regarding other factors which would have prevented acceptance of the bid. *Universal, supra.*

(38) The court concludes that information regarding Prudential's negotiations with GSIC was material. When a bidder has been assured there is no competition, the existence of serious competition (another bidder who has been offered an "exclusive look") is part of the "transaction at hand" and is unquestionably material.

See *Den-Tal-Ez, supra* at 253-54, 566 A.2d at 1230-31; *Delahanty, supra* at 112-13, 464 A.2d at 1254; see also, *Silverman v. Bell Savings & Loan Association*, 367 Pa. Super. 464, 471, 533 A.2d 110, 114 (1987).

Count III—GMH v. All Defendants: Fraudulent Nondisclosure

(39) Count III of GMH's second amended complaint is based on defendants' failure to disclose to GMH the fact that Prudential was negotiating with and laying the groundwork to sell the property to GSIC.

(40) The elements of fraudulent concealment are the same as those of fraudulent misrepresentation, with the additional requirement that the defendant possess a duty to disclose the concealed facts. *Duquesne Light Co. v. Westinghouse Electric Corp.*, 66 F.3d 604, 611-12 (3d Cir. 1995); *Gibbs v. Ernst,* 538 Pa. 193, 207 n.12, 647 A.2d 882, 889 n.12 (1994). See also, *Delahanty,* 318 Pa. Super. at 108, 464 A.2d at 1252 (quoting *Neuman v. Corn Exchange National Bank & Trust Co.,* 356 Pa. 442, 450-52, 51 A.2d 759, 764 (1947).

(41) The clear and convincing evidence which satisfies GMH's burden of proof on its fraudulent misrepresentation claim also satisfies the elements of GMH's fraudulent nondisclosure claim.

(42) A duty to disclose in this case arose from the parties' agreement that the property would be "off the market" while GMH pursued a purchase and sale agreement, which the court has previously found included an obligation to provide notice if a party intended to terminate negotiations, and defendants' continuing assurances that Prudential was not dealing with anyone else. See *Den-Tal-Ez, supra* at 253, 566 A.2d at 1230.

Count IV—GMH v. CB Commercial and Joseph: Corrupt Real Estate Licensees' Practices

(43) GMH has withdrawn Count IV of its second amended complaint.

Count V—GMH v. All Defendants: Conspiracy

(44) Count V of GMH's second amended complaint alleges that defendants engaged in a conspiracy to defraud GMH.

(45) The elements of civil conspiracy under Pennsylvania law are that "two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means," and that they acted with malice. *Thompson Coal Co. v. Pike Coal Co.,* 488 Pa. 198, 211, 412 A.2d 466, 472 (1979). See also, *Shared Communications Services v. Bell Atlantic Properties Inc.,* 692 A. 2d 570, 575 (Pa. Super. 1997).

(46) The court concludes that Prudential, CB Commercial and Joseph engaged in a conspiracy to defraud GMH. The facts which support this conclusion are set forth herein. In particular, the evidence establishes that defendants, acting in concert and with a common purpose, assured GMH that Prudential was not negotiating with others, while knowing Prudential was negotiating with GSIC; represented to GMH that Prudential would sell GMH the property if GMH agreed to pay $107,250,000 in cash; that defendants knew, but did not disclose to GMH, that Prudential was in the final stages of agreeing to sell the property to GSIC; that defendants told GMH that it had to put its acceptance of the price term in writing; that GMH agreed in writing to Prudential's terms in reliance on the representations that Prudential would sell GMH the property on those terms; that Prudential

in fact used GMH's acceptance to induce GSIC to raise the price it was willing to pay for the property and assured GSIC that notwithstanding GMH's "unsolicited bid," it would honor GSIC's exclusivity; that Prudential then, when GSIC did raise the price, agreed to sell the property to GSIC; and that defendants knew GMH would be damaged as a result of their representations and Prudential's sale of the property to GSIC. The court also concludes that defendants acted with malice. See *Shared Communications,* 692 A.2d 575-76.

## Count VI—GMH v. Prudential Realty: Promissory Estoppel

(47) GMH has two grounds for its promissory estoppel claim. The first ground is that Prudential promised to keep the Bala property "off the market" while it was negotiating with GMH; that these promises induced GMH to spend its time and money pursuing a tenant, performing due diligence and engaging in negotiations over the specific terms of the parties' agreement; and that injustice can be avoided only if Prudential's promises are enforced. The second ground is that Prudential promised it would sell the property to GMH for $107,250,000; that Prudential's promise induced GMH to accept Prudential's terms and enter into a lease agreement with AHERF, under which AHERF would completely occupy one of the buildings on the property; and that injustice can be avoided if Prudential's promise is enforced.

(48) "Pennsylvania has long recognized promissory estoppel as a vehicle by which a promise may be enforced in order to remedy an injustice." *Travers v. Cameron County School District,* 117 Pa. Commw. 606, 612, 544 A.2d 547, 550 (1988). (citations omitted) In that case, Pennsylvania adopted the statement of this

doctrine as it appears in the Restatement (Second) of Contracts §90 (1979), which states, in pertinent part:

"(1) [a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires." *Travers,* 117 Pa. Commw. at 613, 544 A.2d at 550-51. See also, *Cardamone v. University of Pittsburgh,* 235 Pa. Super. 65, 74, 384 A.2d 1228, 1233 (1978).

(49) The court has previously found that Prudential promised GMH it would keep the Bala property "off the market" while it was negotiating with GMH for the sale of the property; that Prudential knew GMH would not proceed to spend money on due diligence and attempt to secure a tenant without such assurances; and that GMH did move forward with the transaction in reliance on Prudential's assurances.

(50) The court concludes that injustice can only be avoided by enforcing Prudential's promise to keep the property "off the market" and placing GMH in the position that it would have occupied had Prudential performed. See *Universal Computer,* 628 F.2d 820 (3d Cir. 1980).

(51) The court has previously found that Prudential promised GMH on September 9, 1996 that it would sell the property to GMH if GMH would agree in writing to pay $107,250,000 in cash, and that, in light of the history of negotiations between the parties, Prudential should reasonably have expected GMH to rely on its promise.

(52) The court concludes that Prudential's promise induced GMH to accept Prudential's terms in writing and to finalize its lease agreement with AHERF.

(53) The court concludes that injustice can only be avoided by enforcing Prudential's promise to sell GMH the property for $107,250,000 and placing GMH in the position that it would have occupied had Prudential performed. See *Universal Computer, supra,* 628 F.2d at 820.

## Count VII—GMH v. Prudential Realty: Breach of Duty to Negotiate in Good Faith

(54) Count VII of GMH's second amended complaint is based on GMH's position that Prudential agreed to negotiate in good faith and to keep the Bala property "off the market" while it was negotiating with GMH, and that Prudential breached that agreement.

(55) The United States Court of Appeals for the Third Circuit has predicted that the Pennsylvania Supreme Court would recognize a cause of action for breach of a duty to negotiate in good faith. See *e.g., Flight Systems Inc. v. Electronic Data Systems Corp.,* 112 F.3d 124, 130 (3d Cir. 1997); *Channel Home Centers v. Grossman,* 795 F.2d 291, 299 (3d Cir. 1986).

(56) According to the Third Circuit, "[a]n agreement to negotiate in good faith is a contract." *Flight Systems Inc. supra,* 112 F.3d at 130.

(57) The elements of a cause of action for breach of this duty are:

"(1) both parties manifested an intention to be bound by an agreement to negotiate in good faith; (2) the terms of the agreement were sufficiently definite to be enforced; (3) consideration was conferred . . . and

(4) the agreement was breached by bad faith conduct." *Flight Systems Inc., supra,* 112 F.3d at 130.

(58) Based on the record, the elements of a cause of action for breach of a duty to negotiate in good faith are satisfied in this case.

(59) With respect to the first element, the parties agreed to negotiate for a specific property according to the specific terms of the LOI and agreed the property would be kept "off the market" as long as GMH was "seriously pursuing the acquisition of the property and [was] meeting the deadlines that they had proposed to [Prudential]." (Exhibit P-235; Triece dep. (3/18/97), p. 67.) GMH manifested its intention to be bound by performing due diligence, at substantial expense, by negotiating with AHERF regarding a lease for the property, and by engaging in intensive negotiations with Prudential to finalize the agreement. Prudential also manifested its intention to be bound by taking steps toward the finalization of the agreement, by assuring GMH the property was "off the market" during the negotiations and by extending the period of the LOI while negotiations were continuing. See *e.g., Channel Home Centers, supra,* 795 F.2d at 299-300; *Flight Systems Inc., supra,* 112 F.3d at 130-31.

(60) The terms of the parties' agreement in this case were also sufficiently definite. As set forth above, the LOI contained detailed and specific terms, including a price, and the parties agreed that the property was to be kept "off the market" while serious negotiations were pending.

(61) The element of consideration is also satisfied. Consideration "confers a benefit upon the promisor or causes a detriment to the promisee and must be an act, forbearance or return promise bargained for and given in exchange for the original promise." *Curry v.*

*Estate of Thompson,* 332 Pa. Super. 364, 371, 481 A.2d 658, 661 (1984). The LOI did not require either party to proceed with the negotiations. (See exhibit P-14.) GMH proceeded to do its due diligence and secure its tenant based on Prudential's promise that it could do so "without competing negotiations with other possible suitors for this property." (Exhibit P-234; Glenn dep. (2/24/97), pp. 32-33.) GMH acted to its own detriment by spending its time and money pursuing a tenant, performing due diligence and engaging in negotiations over the specific terms of the parties' agreement. Prudential also received a benefit by agreeing to take the property "off the market"; it obtained a committed buyer and the possibility of a higher price than the market was currently offering, which it realized it could not have done without granting the buyer exclusivity during negotiations. The parties' mutual promises and GMH's conduct in proceeding with the transaction constitute consideration. See *Jeannette Paper Company v. Longview Fibre Company,* 378 Pa. Super. 148, 160, 548 A.2d 319, 325 (1988); *Dahar v. Grzandziel,* 410 Pa. Super. 85, 90, 599 A.2d 217, 219-20 (1991); *Kelly by Kelly v. Ickes,,* 427 Pa. Super. 542, 552-53, 629 A.2d 1002, 1007; see also, *Empire,* 449 Pa. Super. at 487, 674 A.2d at 302 (quoting *KoEune v. State Bank of Schuylkill Haven,* 134 Pa. Super. 108, 112, 4 A.2d 234, 237 (1939).

(62) Finally, Prudential's bad faith is apparent from the record. After keeping GMH negotiating and spending money for months, Prudential started negotiations with GSIC—and even promised GSIC an "exclusive look" at the property—while continuing to negotiate with GMH and without giving GMH any notice that it was terminating negotiations or offering the property to someone else. Prudential then proceeded to entertain

offers from both parties, while still allowing each to think it was the only bidder. After GMH agreed to pay the price Prudential demanded, Prudential told GMH it had accepted an offer from GSIC, and said falsely that negotiations with GSIC had only developed over the last 24 hours. Then, when GMH protested, Prudential took the position that it could not sell the property to GMH unless it formally "unwound" the transaction with GSIC, even though it had not more than a letter of interest with GSIC, and GSIC had not even started the due diligence process.

(63) The court concludes that the parties had an agreement to negotiate in good faith and keep the Bala property "off the market," and that their agreement is enforceable under Pennsylvania law. The Third Circuit decisions recognizing a duty to negotiate in good faith are based on established principles of Pennsylvania contract law and fully consistent with Pennsylvania precedent. As the court made clear in both *Channel Home Centers, supra* and *Flight Systems Inc., supra,* a contract to negotiate in good faith is subject to the same requirements as any other contract: the parties must have manifested an intention to be bound, the terms must be sufficiently definite to be specifically enforced, and there must be consideration. *Flight Systems Inc., supra,* 112 F.3d at 130; *Channel Home Centers, supra,* 795 F.2d at 298-99. See also, *Dahar,* 410 Pa. Super. at 91-92, 599 A.2d at 220-21; *Jeannette Paper Co., supra* at 159, 548 A.2d at 324-25. The parties' agreement to negotiate under specific terms and the assurances that Prudential would keep the property "off the market" meet these requirements.

(64) The Third Circuit's holdings do not create a new cause of action. The court simply recognized that the fact that parties may not have reached an enforceable

agreement of sale on a particular date does not preclude a finding that they reached an enforceable agreement as to other aspects of their transaction. This is fully consistent with Pennsylvania law. See *e.g., Den-Tal-Ez Inc. v. Siemens Capital Corp.,* 389 Pa. Super. 219, 241-42, 566 A.2d 1214, 1225 (1989). See also, *Project Development Group Inc. v. O.H. Materials Corp.,* 766 F. Supp. 1248, 1352-53 (W.D. Pa. 1991), *aff'd mem.,* 993 F.3d 225 (3d Cir. 1993).

(65) Enforcement of such agreements is also consistent with the principle of Pennsylvania contract law that parties can be bound by an agreement that covers essential terms, even if certain details remain to be finalized. See *Field v. Golden Triangle Broadcasting Inc.,* 451 Pa. 410, 419, 305 A.2d 689, 693-94 (1973), *cert. denied,* 414 U.S. 1158 (1974); *Jeannette Paper Company, supra* at 159, 548 A.2d at 324-25.

(66) The claim GMH asserts has also been recognized in other jurisdictions. As one court put it, "[t]he modern view, and the view endorsed by most scholars, is that agreement to negotiate in good faith, unlike mere 'agreements to agree,' are not unenforceable as a matter of law." *Howtek Inc. v. Relisys,* 958 F. Supp. 46, 48, 49 (D.N.H. 1997); see also, *Shann v. Dunk,* 85 F.3d 73, 77 (2d Cir. 1996).

(67) As the Third Circuit has held, an agreement to negotiate in good faith and to keep property "off the market" is a contract separate and distinct from any agreement of sale. It is, therefore, enforceable in its own right, regardless of whether the parties have an enforceable agreement of sale. See *e.g., Flight Systems Inc., supra,* 112 F.3d at 131; *Channel Home Centers, supra,* 795 F.2d at 298 & n.7.

(68) In determining whether an agreement to negotiate in good faith exists, the court can and should look

to the circumstances surrounding the LOI as well as the LOI itself. See *e.g., Flight Systems Inc., supra,* 112 F.3d at 130; *Channel Home Centers, supra,* 795 F.2d at 299-300; *Project Development Group, supra,* 766 F. Supp. at 1352-53.

(69) In *Flight Systems Inc.,* for example, the defendant made similar arguments to the ones defendants make here: that a duty of good faith could not be imposed when a letter agreement between the parties stated that it was contingent on internal approval and an executed lease document. The court rejected this argument, stating that "[t]his evidence merely raises an issue of material fact; it does not preclude the claim since [plaintiff] relies not only on this letter but on [defendant's] course of conduct to argue that [defendant] agreed to negotiate in good faith." *Flight Systems Inc., supra,* 112 F.3d at 131. The same is true in this case.

(70) GMH's evidence regarding the parties' course of conduct, including the oral agreement not to market the property to others, also distinguishes this case from the cases defendants cited at pages 25-26 of their summary judgment brief.

—In *Philmar Mid-Atlantic Inc. v. York Street Associates II,* 389 Pa. Super. 297, 566 A.2d 1253 (1989), plaintiff relied on a letter in which a real estate agent set forth the terms he would be "willing to recommend" to the owner. The court held that the letter, by its terms, did not manifest any intention to be bound by a duty to negotiate: "There is no cause of action to enforce a contract absent a mutual manifestation of assent to be bound." *Philmar, supra* at 302, 566 A.2d at 1254. In this case, however, GMH has established that there *was* a "mutual manifestation of assent to be bound,"

and, therefore, under normal contract law principles, there *is* an enforceable contract. The evidence here goes far beyond the terms of the letter in *Philmar*, including an LOI which set forth the essential terms of the transaction, an oral agreement to keep the property "off the market," and a course of conduct which demonstrated both parties' intention to be bound.

—In *Jenkins v. County of Schuylkill*, 441 Pa. Super. 642, 645, 658 A.2d 380, 383 (1995), the letter on which the plaintiff sought to rely was a general notice that plaintiff was the prime bidder. The parties herein had not agreed to any specific terms, either in the letter or outside of it.

(71) The parol evidence rule does not preclude GMH from offering evidence beyond the language of the LOI. The Pennsylvania Superior Court has specifically held that a letter of intent which does not include a merger clause and does not purport to be the parties' final agreement does not preclude the submission of evidence that the parties orally agreed not to negotiate with others. *Den-Tal-Ez. Inc. v. Siemens Capital Corp.*, 389 Pa. Super. 219, 242, 566 A.2d 1214, 1225 (1989). In that case, although the letter of intent did not expressly prohibit negotiations with others, "the parties were clearly free to prove the existence of other agreements relating to that subject matter, including their oral agreement that [defendant] would not negotiate with [another party] while negotiating with [plaintiff]." The Superior Court further held that, given defendant's repeated assurances that it was not interested in acquiring plaintiff's competitor, plaintiff reasonably saw no need to insist on a clause in the letter of intent prohibiting dual negotiations; defendant's assurances were the "underlying premise" of its negotiations with plaintiff. *Den-Tal-Ez*

*Inc. supra;* see also, *Project Development,* 766 F. Supp. at 1352.[11]

(72) The court has previously found that the LOI was *not* the parties' final agreement, and it did not even purport to preclude oral modification or supplementation of its terms. The right to terminate negotiations went both ways—under the LOI, GMH also did not have an obligation to proceed, or even an obligation to perform due diligence. (See exhibit P-14.) As set forth above, Prudential recognized GMH would *not* proceed unless it could do so "without competing negotiations with other possible suitors for this property" (exhibit P-234; Glenn dep. (2/24/97), pp. 32-33), and Prudential admits it did consider the property "off the market," though it now disputes what that meant. Mr. Robinson, who signed the LOI on GMH's behalf, testified that GMH did not request that an exclusivity provision be included in the LOI because Prudential insisted it wanted to use its standard LOI form. GMH relied instead on Prudential's oral assurances that the property would remain "off the market."

(73) The court concludes that the agreement to keep the property "off the market" is not inconsistent with the provision allowing the parties to terminate negotiations at any time. The agreement is not clear about how negotiations should be terminated and whether

---

11. Even a written contract which specifically forbids oral modifications—which the LOI did not do—can be modified or supplemented orally if the parties clearly intended to do so. See *Empire Properties Inc. v. Equireal Inc.,* 149 Pa. Super. 476, 485-86, 674 A.2d 297, 303 (1996); *Frankford Trust Company v. Stainless Steel Services Inc.,* 327 Pa. Super. 159, 165, 475 A.2d 147, 150-51 (1984); *House of Pasta Inc. v. Mayo,* 303 Pa. Super. 298, 312, 449 A.2d 697, 704 (1982) (quoting *Levicoff v. Richard I. Rubin and Co.,* 413 Pa. 134, 141, 196 A.2d 359, 362 (1964)).

any notice is required. Apparently, in defendants' view, negotiations were terminated if Mr. Glenn thought "in my mind," they were terminated, even if Prudential continued to accept and discuss proposals and did not tell GMH it considered negotiations to be terminated. However, the testimony of both Prudential and GMH representatives supports my conclusion that notice of termination was required. The LOI does not say notice is *not* required, and certainly does not say a person can decide in his mind that negotiations are terminated while with his mouth, he continues to negotiate. An alleged intention to abandon negotiations which is neither communicated nor consistent with subsequent conduct is no abandonment at all.

(74) There is no dispute that both parties considered the property "off the market," and the court has found credible GMH's evidence of the very specific assurances defendants and their representatives made to GMH that they were not negotiating with anyone else. This evidence does not vary the terms of the LOI, but this evidence supplements the LOI and clarifies the terms and conditions under which negotiations would be conducted and, if necessary, terminated. Under Pennsylvania law, "[w]here, as here, an ambiguity exists in the contract, parol evidence is admissible to explain, clarify or resolve the ambiguity, irrespective of whether the ambiguity is created by the language of the agreement or by extrinsic or collateral circumstances." *Sun Company Inc. v. Pennsylvania Turnpike Commission,* 708 A.2d 875, 878 (Pa. Super. 1998). This is particularly true when a party admits it made assurances which were not included in the agreement, and when the party's litigation position is inconsistent with its course of conduct after entering the agreement. *Sun Company Inc., supra* at 879. As the Pennsylvania courts have held,

"the course of conduct of a party is always relevant in interpreting a contract and may be the strongest indication of the intention of the parties to the contract." *Sun Company Inc., supra* at 880; *Atlantic Richfield Co. v. Razumic*, 480 Pa. 366, 390 A.2d 736 (1978).

## DAMAGES

### *General*

(75) "The determination of damages is a factual question to be decided by the fact-finder." *Delahanty v. First Pennsylvania Bank N.A.*, 318 Pa. Super. 90, 117, 464 A.2d 1243, 1257 (1983).

(76) Plaintiff bears the burden of proving damages by a preponderance of the evidence. In order to satisfy that burden, "plaintiff is required to furnish only a reasonable quantity of information from which the fact-finder may fairly estimate the amount of damages." *Delahanty, supra* at 118, 464 A.2d at 1257.

(77) "Though justice and public policy require that the wrongdoer bear the risk of uncertainty which his own wrong has created and which prevents the precise computation of damages, the fact-finder still may not render a verdict based on speculation or guesswork. . . . Yet, the fact-finder may make a just and reasonable estimate of the damage based on relevant data, and in such circumstances may act on probable and inferential, as well as upon direct and positive proof. . . . Thus, the law does not demand that the estimation of damages be completely free of all elements of speculation." *Delahanty, supra.*

(78) "[D]amages need not be proved with mathematical certainty, but only with reasonable certainty, and evidence of damages may consist of probabilities

and inferences." *Delahanty, supra* at 119, 464 A.2d at 1257.

## Count I—Damages—GMH v. Defendant Prudential Realty: Breach of Contract

(79) Where the amount of damage can be fairly estimated from the evidence, the recovery will be sustained even though such amount cannot be determined with entire accuracy. . . . It is only required that the proof afford a reasonable basis from which the fact-finder can calculate the plaintiff's loss." *Delahanty, supra* at 119, 464 A.2d at 1258.

(80) "In a breach of contract action, damages are awarded to compensate the injured party for loss suffered due to the breach. The purpose of damages is to put the plaintiff in the position he or she would have been in but for the breach." *Empire Properties Inc. v. Equireal Inc.,* 449 Pa. Super. 476, 490, 674 A.2d 297, 303 (1996).

(81) The measure of damages for breach of an oral contract to sell real property is "the money that was paid on account of the purchase and the expenses incurred on the faith of the contract . . . Where the oral agreement has been obtained by fraud, however, the buyer may recover as damages the loss of his bargain . . . Such fraud must be actual fraud that reaches back to the original contract." *Fannin v. Cratty,* 331 Pa. Super. 326, 334, 480 A.2d 1056, 1060 (1984). (citations omitted) See also, *Empire,* 449 Pa. Super. at 491-92, 674 A.2d at 304-305; *Delahanty, supra* at 119-20, 464 A.2d at 1258.

(82) The court concludes that Prudential obtained the oral agreement of September 11, 1997 by fraud.

(83) The elements of fraud are set forth herein above. The court has concluded that GMH has established each of these elements by clear and convincing evidence. The evidence which led the court to conclude that defendants were liable for fraudulent misrepresentation and nondisclosure under Counts II and III also establishes that the oral agreement of September 11, 1996 was obtained by fraud.

(84) In particular, GMH has established by clear and convincing evidence that Mr. Glenn represented to GMH that Prudential would sell GMH the property if GMH agreed to pay $107,250,000 in cash; that Mr. Glenn knew, but did not disclose to GMH, that Prudential was in the final stages of agreeing to sell the property to GSIC; that Mr. Glenn and Mr. Joseph told GMH that it has to put its acceptance of the price term in writing; that GMH agreed to Prudential's terms in reliance on the representations that Prudential would sell GMH the property on those terms; that Prudential in fact used GMH's acceptance to induce GSIC to raise the price it was willing to pay for the property and assured GSIC that notwithstanding GMH's "unsolicited bid," it would honor GSIC's exclusivity; that Prudential then, when GSIC did raise the price, agreed to sell the property to GSIC; and that GMH was damaged as a result of Prudential's representations and its sale of the property to GSIC.

(85) "The essence of fraud is in the misrepresentation that occurs when a defendant make a bargain with no intention of living up to it." *American Trade Partners v. A-1 International Importing Enterprises,* 755 F. Supp. 1292, 1301 (E.D. Pa. 1990).

(86) Because Prudential obtained the oral agreement of September 11, 1996 by fraud, GMH is entitled to recover the profits it lost due to Prudential's breach

of the oral agreement. The court concludes that GMH has proven with reasonable certainty that it incurred lost profits in the amount of at least $20,340,623.

(87) GMH also seeks damages for injury to its business reputation due to Prudential's refusal to sell it the property. While GMH has not quantified these damages, the court concludes that GMH has provided a reasonable quantity of information from which this court may fairly estimate the amount of the damages. This satisfies GMH's burden of proving damages under Pennsylvania law. *Delahanty, supra;* see also, *AM/PM Franchise Association v. Atlantic Richfield Co.,* 526 Pa. 110, 584 A.2d 915 (1990); *Miller Oral Surgery Inc. v. Dinello,* 416 Pa. Super. 310, 320-21, 611 A.2d 232, 237-38 (1992).

(88) As set forth above, the court concludes that the evidence establishes that GMH was a successful real estate development company which had acquired over one billion dollars worth of real estate in 14 years in business, and which was poised to become a national player. Gary Holloway, GMH's owner, had a specific business plan that contemplated combining an existing GMH portfolio with the Bala property in order to be able to move to the national real estate market and, ultimately, to form an REIT. The court has found Michael Fascitelli credible when he testified that he currently heads an REIT and has years of experience in the national real estate market, and that a company which plans to move from being a regional to a national real estate player must develop a track record of closing large deals with national "players" such as Prudential. The court has also previously found Mr. Fascitelli credible when he testified that the failure to close a large deal like the Bala transaction has serious ramifications— it makes it harder for a company to receive offering

memoranda from the national "players" and to be given real consideration for large deals, because of the perception that the company could not close a deal. Although Mr. Fascitelli could not quantify the damage due to loss of reputation suffered by GMH as a result of failing to close the Bala deal, he testified that it was in the millions of dollars.

(89) The court has found Mr. Fascitelli qualified as "an expert in the field of real estate transactions, real estate trusts and the type of custom and practice in the business entailed in a transaction such as that under consideration at this time." (Fascitelli N.T. (6/19/98), pp. 25-26.)

(90) Mr. Fascitelli is qualified as an expert to testify about the impact of the failure to close the Bala transaction on GMH's plans to become a participant in the national real estate market.

(91) The court concludes that GMH has proven that its reputation was damaged by defendants' conduct, and defendants' conduct injured GMH's ability to enter into other transactions of a type and size similar to the Bala transaction. Only the dollar amount of damages is uncertain. However, GMH has proven that the loss of just one transaction, the Bala transaction, caused it damages of more than $20 million. This gives the court a benchmark for calculating the impact on GMH of losing other similar transactions.

(92) The evidence allows the court to conclude that GMH lost at least one additional transaction of a type and size similar to the Bala transaction as a result of defendants' conduct. GMH may continue to lose similar transactions.

(93) The court concludes that the fact that GMH and its witnesses have stated that they cannot put a specific dollar figure on damages due to loss of repu-

tation does not, as defendants urge, mean that these damages are unduly speculative. "While the trier of fact may not use sheer conjecture as a basis for arriving at a verdict, it may use a measure of speculation in aiming at a verdict or an award of damages, and *an even greater degree of flexibility is granted in regard to testimony concerning prospective or future damages, which are at best, not always easy or certain of ascertainment and are to a large extent based on probabilities and uncertainties." Delahanty, supra* at 118, 464 A.2d at 1257. (emphasis added) "So then, mere uncertainty as to the amount of damages will not bar recovery where it is clear that the damages were the certain result of defendant's conduct." *Delahanty, supra* at 118-19, 464 A.2d at 1257; see also, *Rizzo v. Haines,* 520 Pa. 484, 505, 555 A.2d 58, 68 (1989), citing *Pashak v. Barish,* 303 Pa. Super. 559, 561-62, 450 A.2d 67, 69 (1982).

### Count II—Damages—GMH v. All Defendants: Fraudulent Misrepresentations

### Count III—Damages—GMH v. All Defendants: Fraudulent Nondisclosure

(94) The damages available under Counts II and III are the same and, to avoid duplication of damages, the court will treat those counts together.

(95) "Under Pennsylvania law, in an action based on fraud, the measure of damages is 'actual loss,' . . . and not the benefit, or value, of that bargain. . . . The victim is entitled to all pecuniary losses which result as a consequence of his reliance on the truth of the representations." *Delahanty, supra* at 117, 464 A.2d at 1257. (citations omitted)

(96) Because this court has found in favor of GMH on its fraud counts, GMH "is entitled to all pecuniary losses which result as a consequence of [its] reliance on the truth of the representations." *Delahanty, supra.*

(97) GMH has quantified the following items of damage:

(1) $128,125 per month of personnel time[12] spent in reliance on defendants' misrepresentations, and $24,176.24 in incurred expenses (the majority of which were incurred by July 1).

(2) It would have earned at least $20,340,623 in profits had it purchased the Bala property.

(98) The court concludes that GMH is entitled to recover its reliance damages as set forth in paragraph 96(1) above, but in view of the fact that the court is awarding "benefit of the bargain" damages, reliance damages would be duplicative and, thus, are not included in the award.

(99) The court concludes that GMH is also entitled to recover its lost profits on the Bala transaction, in the amount of at least $20,340,623. Lost profits are among the damages recoverable for fraud. See *e.g., Scaife Co. v. Rockwell-Standard Corp.,* 446 Pa. 280, 291-92, 285 A.2d 451, 457 (1971); *Delahanty, supra* at 128, 464 A.2d at 1262; *Lokay v. Lehigh Valley Cooperative Farmers Inc.,* 342 Pa. Super. 89, 99, 492 A.2d 405, 410 (1985); *Aiello v. Ed Saxe Real Estate Inc.,* 327 Pa. Super. 429, 440, 476 A.2d 27, 33-34 (1984), *rev'd on other grounds,* 508 Pa. 553, 499 A.2d 282

___

12. GMH quantified personnel time on the Bala deal by assuming a 40-hour work week and approximately four months of negotiations/due diligence from mid-May to mid-September 1996. The total value of personnel time for that period was $512,500. (Robinson N.T. (6/18/98), pp. 201-202; exhibit P-153.)

(1985); *Tunis Bros. Co. Inc. v. Ford Motor Co.*, 952 F.2d 715 (3d Cir. 1991).

(100) The court concludes that the cases defendants have cited for the proposition that a defrauded plaintiff cannot recover the "benefit of the bargain" do not preclude GMH's lost profits claim. As the Superior Court explained in *Lokay*, the "benefit of the bargain" rule precludes a plaintiff who is deceived into believing that something is worth more than it actually is from recovering damages based on its lost expectation. The rule did not preclude plaintiff in *Lokay* from recovering the salary and benefits he lost when he was fraudulently induced to leave his job; the salary and benefits were the "actual loss" plaintiff incurred. In the Superior Court's words:

"At first, recovery of these losses appears to be recovery of a lost expectation, in violation of the rule that a fraud plaintiff is limited to damages for 'actual loss.' However, in an employment context lost future income is in fact what the plaintiff loses when he is induced to leave an otherwise ongoing position; this is not the archetypal fraud fact-pattern in which a plaintiff was tricked into buying something for more than it was worth, or selling for less than that." *Lokay*, 342 Pa. Super. at 100, 492 A.2d at 410. Likewise, in this case, GMH's lost profits are part of the actual loss it incurred when Prudential sold the property to GSIC after fraudulently representing to GMH that it was not dealing with other bidders.

(101) The court concludes that an award of damages for injury to its business reputation due to Prudential's refusal to sell it the property is too speculative in nature, but the court will consider said injury to business reputation as a factor in determining punitive damages.

Count V—Damages—GMH v. All Defendants:
Civil Conspiracy

(102) The damages allowable for civil conspiracy "are such only as naturally and proximately result from the wrongful act or acts done in pursuance of the conspiracy, prior to the commencement of the action, and which directly result from the conspiracy . . . ." *Rumbaugh v. Beck,* 411 Pa. Super. 220, 238, 601 A.2d 319, 328 (1991) (quoting 15A C.J.S. *Conspiracy* §33, at 715 (1955)).

(103) Defendants who are liable for civil conspiracy are jointly and severally liable for all damages resulting from the conspiracy. See *Lough v. Consol-Pennsylvania Coal Co.,* 6 F.3d 88, 100 (3d Cir. 1993).

(104) The court concludes that the damages which naturally and proximately result from defendants' wrongful acts pursuant to their conspiracy consist of the following:

(1) Costs spent as set forth in costs in paragraph 96(1) above, in reliance on defendants' misrepresentations.[13]

(2) At least $20,340,623 in profits GMH would have earned had it purchased the Bala property.

Count VI—Damages—GMH v. Prudential Realty:
Promissory Estoppel

(105) The damages recoverable under a promissory estoppel theory are explained in the Restatement (Second) of Contracts §90, commented:

"A promise binding under this section is a contract and full-scale enforcement by normal remedies is often

---

13. Reliance damages are not included in the damage award for the reasons stated in paragraph 98 above.

appropriate. But the same factors which bear on whether any relief should be granted also bear on the character and extent of the remedy. In particular, relief may sometimes be limited to restitution or to damages or specific relief measured by the extent of the promisee's reliance rather than by the terms of the promise. . . . Unless there is unjust enrichment of the promisor, damages should not put the promisee in a better position than performance of the promise would have put him." *Travers*, 117 Pa. Commw. at 614 n.5, 544 A.2d at 551 n.5.

(106) The damages available under a promissory estoppel theory include the amounts plaintiff lost due to defendants' failure to keep their promise. *Travers, supra.* This can include an award of lost profits. See *Universal Computer Systems v. Medical Services Associations,* 628 F.2d 820, 825-26 (3d Cir. 1980).

(107) The court concludes that the damages which are necessary to prevent injustice and to put GMH in the position in which it would have been had Prudential performed its promise to keep the property "off the market" consist of the following:

(1) $536,676.24 spent on or after May 13, 1996 in reliance on Prudential's promise.[14]

(2) At least $20,340,623 in profits GMH would have earned had it purchased the Bala property.

(108) The court concludes that GMH is entitled to a damage award under the promissory estoppel theory but is not awarding same herein as it would be duplicative.

---

14. Reliance damages are not included in the damage award, however, for the reasons stated in paragraph 98 above.

Count VII—Damages—GMH v. Prudential Realty:
Breach of Duty to Negotiate in Good Faith

(109) As set forth above, the court concludes that an agreement to negotiate in good faith and to keep property "off the market" is governed by the same principles of Pennsylvania law that govern any other contract. This also applies to damages.

(110) "In a breach of contract action, damages are awarded to compensate the injured party for loss suffered due to the breach. The purpose of damages is to put the plaintiff in the position he or she would have been in but for the breach." *Empire Properties Inc. v. Equireal Inc.,* 449 Pa. Super. 476, 490, 674 A.2d 297, 303 (1996). Upon proper proof, damages for breach of contract include lost profits. *Delahanty, supra* at 120, 464 A.2d at 1258.

(111) Damages recoverable for Prudential's breach of its agreement to negotiate in good faith and keep the property "off the market" include GMH's lost profits. In *Project Development, supra,* the district court held under Pennsylvania law that a plaintiff whose alleged breach of an oral exclusivity agreement could seek lost profit damages:

"With regard to [plaintiff's] claim for damages in the form of profits it would have realized but for [defendants'] breach, under Pennsylvania law, lost income or profit damages are recoverable where they can be proved with reasonable certainty. *Delahanty v. First Pennsylvania Bank N.A.,* 318 Pa. Super. 90, 126, 464 A.2d 1243, 1261 (1983). [Defendant's] claim that [plaintiff] is limited to its bid preparation costs is without merit." 766 F. Supp. at 1353. See *Howtek, supra,* 958 F. Supp. at 49.

(112) The court concludes that the damages recoverable under Count VII consist of the following:

(1) $536,676.24 spent on or after May 13, 1996 in reliance on the promise to negotiate in good faith and keep the property "off the market."[15]

(2) $20,340,623 in profits GMH would have earned had it purchased the Bala property.

### Punitive Damages

(113) GMH has also requested an award of punitive damages.

(114) "It is well settled law in Pennsylvania that the decision of whether to award punitive damages and the amount to be awarded are within the discretion of the fact-finder." *Delahanty, supra* at 129, 464 A.2d at 1263.

(115) Punitive damages are awarded to punish wrongdoers for outrageous conduct and to deter both the defendants and others from such conduct. See *e.g., Delahanty, supra;* see also, *SHV Coal Inc. v. Continental Grain Co.,* 526 Pa. 489, 493, 587 A.2d 702, 704 (1991). Such damages are appropriate "when the act which creates actual damages also imports insult or outrage, and is committed with a view to oppress or is done in contempt of plaintiffs' rights." *Delahanty, supra* at 129, 464 A.2d at 1263.

(116) "Punitive damages may be given when the act is done with reckless indifference, as well as, bad motive." *Delahanty, supra* at 130, 464 A.2d at 1263; *SHV Coal, supra* at 495, 587 A.2d at 704-705.

(117) In determining whether and what amount of punitive damages to award, the fact-finder "can properly

---

15. Reliance damages are not included in the damage award, however, for the reasons stated in paragraph 98 above.

consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant." *SHV, supra* at 493, 587 A.2d at 704 (quoting Restatement (Second) of Torts §908(2)). See *Kirkbride v. Lisbon Contractors Inc.,* 521 Pa. 97, 102, 555 A.2d 800, 803 (1989).

(118) Under Pennsylvania law, punitive damages need not be proportional to the compensatory damages awarded. *Kirkbride, supra* at 103, 555 A.2d at 803-804. As the Pennsylvania Supreme Court explained, a proportionality requirement between punitive and compensatory damages would defeat the purpose of punitive damages, which is "to punish a tort-feasor for outrageous conduct and to deter him or others from similar conduct":

"It is for this reason that the wealth of the tort-feasor is relevant. In making its determination, the jury has the function of weighing the conduct of the tort-feasor against the amount of damages which would deter such future conduct. In performing this duty, the jury must weigh the intended harm against the tort-feasor's wealth. If we were to adopt the appellee's theory [requiring proportionality], outrageous conduct, which only by luck results in nominal damages, would not be deterred and the sole purpose of a punitive damage award would be frustrated. If the resulting punishment is relatively small when compared to the potential reward of his actions, it might then be feasible for a tort-feasor to attempt the same outrageous conduct a second time." *Kirkbride, supra* at 103, 555 A.2d at 803.

(119) Defendants' conduct was outrageous. As set forth in detail in the findings of fact herein while cultivating a relationship of trust with GMH over many months of negotiation, and while specifically assuring

GMH that they were not dealing with other prospective buyers, defendants took steps to sell the property to GSIC. Defendants' conduct was willful, and punitive damages are appropriate to punish defendants for their behavior and to deter such conduct in the future. Prudential and CB intentionally and with deceit schemed to drive up the purchase price of the Bala properties by using GMH as a pawn in their plan to play GSIC and GMH off of one another without either's knowledge. To further their scheme, defendants actively deceived GMH with their repeated assurances that it was GMH's deal. Further, defendants represented to GMH that Prudential would sell the property for a cash payment of $107,250,000 and then, when GMH agreed to that price, used GMH's agreement to obtain a higher price from GSIC. The court concludes that defendants acted with a bad motive or, at the very least, with reckless indifference to GMH's rights.

(120) Defendants' acts caused serious harm to GMH, including substantial lost profits on the Bala transaction itself and injury to GMH's reputation and business plans.

(121) Prudential and CB Commercial are very wealthy national companies. The evidence established that Prudential's net worth, calculated according to general accepted accounting principles, is $19.718 billion. CB's stockholders' equity is $157,771,000.

(122) All of these factors support an award of punitive damages in this case. See *e.g., SHV Coal, supra.* In *SHV*, the Pennsylvania Supreme Court held that punitive damages were recoverable based on facts comparable to those in this case. A coal broker employed by SHV accepted a job offer from one of its competitors and diverted to the competitor a contract he had solicited on behalf of SHV, in part by misrepresenting that SHV intended to close an office. The trial court awarded

compensatory and punitive damages against both the coal broker and the company to which he had diverted the contract. *SHV, supra* at 491, 587 A.2d at 703. Reversing the Superior Court, which had held that there was no outrageous conduct to support an award of punitive damages, the Supreme Court held that there was sufficient evidence to support the award of punitive damages. *SHV, supra* at 493, 587 A.2d at 705. This included evidence that a customer was "ready, willing and able to give a purchase order for coal to SHV," and that the broker approached the customer when he had already accepted a job offer from SHV's competitor, but did not disclose that information to SHV. "From this circumstantial evidence and reviewing the credibility of all the witnesses, the chancellor could conclude that but for the actions of both [the broker] and ContiCoal, the SHV-Eastman Kodak contract would have been solidified." *SHV, supra* at 496, 587 A.2d at 705.

(123) Similarly, in *Delahanty, supra* at 132, 464 A.2d at 1264, the Superior Court affirmed an award of punitive damages in an amount that was a multiple of the amount of compensatory damages. In *Delahanty*, the evidence established that the officers of the defendant bank used information provided by plaintiff in confidence to support defendant's own competing business and to injure plaintiff's business. The Superior Court agreed that this evidence was sufficient to support the trial court's finding that defendant's conduct was outrageous and involved a bad motive. *Delahanty, supra* at 132, 464 A.2d at 1264-65. The court concluded that the trial court properly considered "not only the bank's wealth but also, the outrageous conduct of the bank's officials, their motive, the relationship between the parties and the nature and extent of the harm to [plaintiffs'] businesses." *Delahanty, supra* at 136, 464 A.2d at 1266;

see also, *Jeannette Paper, supra* at 165, 548 A.2d at 327-28.

(124) The court concludes that Prudential is vicariously liable for punitive damages based on the actions of Mr. Glenn. As set forth above, his actions were during the course of his employment, within the scope of his duties, and done with the intent to further Prudential's interests.

(125) For the same reason, CB Commercial is vicariously liable for punitive damages based on the actions of Mr. Joseph.

## Total Damages

(126) The court concludes that the total damages recoverable by GMH in this action consist of the following:

(1) The sum of $20,340,623 in profits GMH would have earned had it purchased the Bala property.

(2) The sum of $10,000,000 in punitive damages from Prudential and from CB Commercial.

## VERDICT

The court hereby finds in favor of plaintiff GMH Associates Incorporated in the amount of $20,340,623, plus an amount of $10,000,000 in punitive damages and against defendants The Prudential Realty Group, CB Commercial Real Estate, and Douglas Joseph.

## AMENDED VERDICT

The court hereby finds in favor of plaintiff GMH Associates Incorporated in the amount of $20,340,623 and against defendants The Prudential Realty Group, CB Commercial Real Estate and Douglas Joseph.

The court further finds in favor of plaintiff GMH Associates Incorporated in an amount of $10,000,000 in punitive damages and against defendant The Prudential Realty Group in the amount of $7,000,000 and against defendant CB Commercial Real Estate in the amount of $3,000,000.

## JUDGMENT

And now, December 3, 1998, it is hereby ordered that judgment shall be entered on the amended verdict dated December 2, 1998 in favor of plaintiff GMH Associates Incorporated in the amount of $20,340,623 and against defendants The Prudential Realty Group, CB Commercial Real Estate and Douglas Joseph and in favor of plaintiff GMH Associates Incorporated in an amount of $10,000,000 in punitive damages and against defendant The Prudential Realty Group in the amount of $7,000,000 and against defendant CB Commercial Real Estate in the amount of $3,000,000.

## SUPPLEMENTAL OPINION

CLOUSE, *J.,* February 8, 1999—Plaintiff GMH Associates Inc. filed a complaint against The Prudential Realty Group, CB Commercial Real Estate Group and Douglas Joseph for damages arising out of the failure of a commercial real estate transaction. A trial was held before this court, sitting without a jury, on June 15 through 19, 1998, June 23 through 25, 1998 and July 22, 1998. The court, in a verdict and opinion dated September 16, 1998, found in favor of plaintiff GMH Associates Inc.; said verdict was amended on December 3, 1998. Defendants filed post-trial motions which were denied by the court, by order dated December 3, 1998.

Defendants have now filed a notice of appeal to the Superior Court of Pennsylvania.

The court hereby incorporates its opinion dated September 16, 1998, filed in the instant matter. To the extend that evidentiary issues raised by appellant in paragraph 5 of appellant's statement filed pursuant to Pa.R.A.P. 1925(b) are not addressed in the court's September 16, 1998 opinion, the reasons for this court's rulings can be found in the trial record at the following locations:

(1) With respect to the testimony of Bruce Robinson as a fact witness, and not as an expert, see, *e.g.*, N.T. June 18, 1998, pp. 72-73, 141-55, and see generally, *id.* at 155-87.

(2) With respect to the exclusion, in the court's discretion, of that portion of Mr. Golboro's expert testimony regarding custom and usage in the real estate industry, see N.T. 6/24/98 at pp. 178-89, 260-64.

For the foregoing reasons, the court properly denied defendants' post-trial motions.

Connors v. Dawgert